# Exhibit 6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EMILEY SCHOONOVER, individually and on behalf of similarly situated individuals,<br><br>Plaintiff,<br><br>                               v.<br><br>IOVATE HEALTH SCIENCES U.S.A. INC., a Delaware corporation,<br><br>Defendant | Case No. 2:20-cv-01487-FLA-AGR<br><br>Hon. Fernando L. Aenlle-Rocha |

**DECLARATION OF EXPERT GLENN MAY**

# TABLE OF CONTENTS

I.      Introduction ................................................................................................1

II.     Qualifications ..............................................................................................1

III.    Information Considered ...............................................................................5

IV.     Summary of Observations and Conclusions ...............................................5

V.      Technical Background: The Packaging Industry and Dietary
        supplement Powder .....................................................................................8

        A.      Containers, Or Canisters. .................................................................9

        B.      Utensils, Or Scoops, Desiccants and Promotional Items. ..............13

        C.      Availability Of Stock Packaging. ...................................................13

        D.      Dietary Supplement Powder and Managing Settling of Low
                Bulk Density Products During Package Filling Operations. ...............16

VI.     Relevant Legal Standards ..........................................................................19

VII.    Defendant's Accused Products Exhibit Non-Functional Slack-Fill ...........22

        A.      Defendant's Six Star Pro Nutrition Pre-Workout Explosion
                Products Contain Nonfunctional Slack-Fill. ....................................22

        B.      Competitive Products In The Field Exhibit Less Headspace and
                Less Non-Functional Slack-Fill. .....................................................24

        C.      Consumer  Behavior And Understanding Of The Accused
                Products. ........................................................................................55

VIII.   CONCLUSION ..........................................................................................56

## I.      INTRODUCTION

I have been asked by McGuire Law, P.C., to offer my opinions relating to the above-referenced matter.  I understand that Emiley Schoonover ("Schoonover") asserts in this case that Iovate Health Sciences U.S.A., Inc., has committed violations of State Consumer Protection Laws, including California's Consumer Legal Remedies Act, California Civil Code § 1750, *et seq.*, False Advertising Law, Business & Professions Code § 17500, *et seq.*, and also claims unjust enrichment.

I submit this Declaration to provide relevant background information and my expert opinion regarding the products at issue, and to set forth my opinions about the standard or common industry meaning of certain disputed matters related to asserted confidential information or trade secrets.  As relevant to the issues discussed herein, this Declaration also provides my understanding of certain design features and functionality from the perspective of an expert in the packaging industry.  If called as a witness to testify at a hearing, I expect to testify on the following topics and provide opinions and testimony on what is summarized in this declaration.

In formulating my opinions and preparing this report I have relied upon the documents and items listed in Exhibit C.  I have also relied upon my training and experience and such other materials on which experts in this field normally rely.  My citation to any particular document or item does not necessarily mean that document or item is the sole or primary source for the proposition for which it is cited.

I am being compensated for my time spent on this matter at my usual and customary rate of $350 per hour, plus reasonable expenses.  My compensation is not related to the outcome of this action, and I have no financial interest in this case or any of the parties.

I have previously served as an expert in packaging disputes and have testified as an expert witness by deposition in two cases.

## II.     QUALIFICATIONS

1.      The following is a summary of my background and qualifications most relevant to the issues in this matter.  My background and qualifications are more fully set out in my curriculum vitae ("CV"), attached as Exhibit A.

2.      I have three decades of experience in packaging component design, development, testing, sourcing, and troubleshooting for large and small consumer packaged goods ("CPG's") companies and packaging suppliers in the fields of Nutraceuticals, Cosmetics, Personal Care,

Food, Beverages, Alcohol, Pet Products, Home Care and Automotive Care products, Over-the-Counter ("OTC") Drug products, Electronics, and other products. My experience in these areas includes packaging components and the packaging process for low bulk density powders and similar products, including dietary supplement powders. I have extensive experience with slack-fill and functional fill issues related to containment of low bulk density products in rigid and semi-rigid packaging, including canisters, bottles, closures, labels, seals, and other components, as well as the equipment used to fill and assemble these components.

3.    I am currently the owner of ProPac Consulting, which provides engineering solutions for a multitude of packaging and product challenges, including innovation, technical support, material development, sales and business development, operations, supply chain and process optimization, mold and equipment design and development, process development, troubleshooting, cost savings, sustainability, and packaging testing.

4.    In 1992, I earned a Bachelor of Science degree in Packaging Science from the School of Packaging at Michigan State University. My studies included coursework specific to dispensing packaging components. In 1995, I was awarded an FDA/FPI certification in food processing from the University of California, Davis (Container Closure and Thermal Processing) in 1995. I have also been awarded Certified Packaging Professional (CPP) status by the Institute of Packaging Professionals (IoPP).

5.    Over the course of my thirty-year career, I have gained in-depth experience with many packaging materials, components, processes, suppliers, tooling and equipment, and packaging platforms. My work has entailed designing, engineering, developing and producing numerous packaging components, and working with associated molding, filling and assembly machines. More specifically, my work with Merle Norman Cosmetics, Nestle USA, The Clorox Company (Clorox), Method Inc., Ecologic Brands, Constellation Brands, PepsiCo, and other end-users, has involved packaging design, development, manufacturing, production, and distribution of packaging for products with low bulk densities, including powders. In the course of my working career, I have also attended various packaging trade shows, such as PackExpo/PMMI, Interpack, and others, and subscribe to widely-distributed packaging industry publications such as *Packaging Digest* and *Packaging World*.

6.    My work efforts in the packaging industry have received several industry awards and other industry recognitions. For example, I have received the following:

- 2001 IoPP AmeriStar Best of Food Category Packaging Award, (HV Easy Squeeze Inverted Bottle with silicone valve);

- 2001 WordStar Award (HV Easy Squeeze Inverted Bottle with silicone valve);

- US Patent D471,462 for HV Easy Squeeze Inverted Bottle with silicone valve;

- 2008 IoPP Ameristar for Method molded bamboo fiber packaging used with "omop" cleaning tools and components; and

- 2015 AmeriStar Winner of "Best in Category" for Ecologic Brands Nestle-Purina ProPlan Cat Litter molded fiber containers.

7.     I have given presentations on packaging technology to professionals at industry conferences, including at the Universal Design Conference, Brand Identity & Package Design Seminar, CMA Annual Meeting (Closure Manufacturers Association), Brazilian Packaging Association: Design Conference; Sustainability in Packaging Conference (Intertech Pira), IoPP Transport Packaging Committee, Cleaning Products Conference, "Thinking Outside the Box", and ISRI (International Scrap Recyclers Institute).

8.     Over the course of my career, I have garnered substantial experience in designing, specifying, testing, qualifying, purchasing, developing, and troubleshooting packaging systems, including packaging for products with low bulk density.  For example, as a Packaging Engineer at Merle Norman Cosmetics, I researched, specified, purchased, and developed custom tooling and packaging components for powder foundation cosmetics products, including extrusion blow molded jars and injection molded jars and closures.  As a Packaging Manager at Nestlé, I researched, specified, customized, commissioned, and modified several packages for low-density products including canisters for bulk Nestlé cocoa powder and Nestlé dry coffee creamer, as well as medium density products such as Nestlé baked snack products and Purina and Friskies dry pet food and cat litter in rigid tubs and flexible bags.

9.     As Senior Packaging Engineer, Research Fellow and Packaging Group Manager at The Clorox Company ("Clorox), I led packaging & equipment development for Hidden Valley salad dressings, K.C. Masterpiece barbecue sauces and other condiments and sauces, including dry seasoning products in canisters and pouches.  I also was responsible for developing packaging for other powder products, such as Clorox dry bleach powders in canisters, Kingsford Charcoal in bags and rigid containers, and Fresh Step and Scoop Away cat litter in rigid pails and flexible bags.

Furthermore, I helped with packaging development for numerous nutraceutical products, including low bulk density powdered products for Clorox brands RenewLife and Rainbow Light.

10.　　As Senior Director of Packaging at Method Inc., I was responsible for leading custom packaging development for an array of packaging, including innovative canisters, trays, tubs and closures.

11.　　As Chief R&D Officer at Ecologic Brands, I was responsible for the research, design, development, and modification of unique "bag-in-bottle" packaging, including that used by dietary supplement powder customers.  Specifically, I developed canisters for with low density dietary supplement powder brands BodyLogix, Kaizen Naturals, and Muscle Milk, working with product several filling locations and a variety of filling equipment.  I also developed jug style packaging for a unique, low density "paper-based" cat litter for Nestle's Tidy Cat brand, working through challenges related to fluctuating bulk density related to a new product production process.

12.　　As a SME (Subject Matter Expert) on packaging and slack-fill at Clorox, I taught internal classes on the matter to classes of packaging professionals numbering over 50 persons.  I am versed in the concepts of functional fill and deceptive packaging.  I have a deep understanding of net weights, MAV (Maximum Allowed Variance), volumetric filling, effects of distribution and product settling, bulk density, label claims, batch versus continuous production, raw ingredient inputs, filling equipment, in-pack inclusion of consumer measuring devices and promotional articles, and other potential impacts on functional versus slack-fill.  I have conducted physical testing, written specifications, developed quality control standards, and led troubleshooting of packaging systems, production processes, assembly, and analysis of many packages and issues related to slack-fill.

13.　　My experience with consumer packaging includes working closely with Marketing and Sales functions to understand consumer perception, behavior, needs, trends and purchase intent, including participating in numerous consumer studies such as in-home use tests (IHUT's), centralized location tests (CLT's), consumer surveys, and review of consumer complaint data to determine and solve packaging issues.

14.　　Since 2008, I have owned and operated a Packaging Design and Development consulting business, ProPac Consulting.  I have consulted for numerous companies in the food, beverage, personal care, and cosmetics categories, including L'Oreal, Pepsico Global (Pepsi), Columbus Foods, Kraft-Heinz, Plenty Ag, Fresh Express, Pendulum Therapeutics, Church &

Dwight, and many other end-users of packaging for low density products. In this role, I have developed rigid and flexible packaging for low density products including Pepsico's Frito Lay salted snacks and their Quaker oats products, as well as trays for fresh leafy greens such as spinach and kale for Plenty Unlimited.

15.    I am a named inventor on several patents, including three patents concerning packaging innovations. I am also an inventor on a patent relating to a new product innovation.

16.    I have previously served as an expert witness in several packaging-related disputes. A list of all other cases in which, during the previous 4 years, I have testified as an expert, is provided in **Exhibit B**. I have authored no publications in the previous 10 years.

## III.    INFORMATION CONSIDERED

17.    In preparing my report, I have considered a variety of information and documents, including the materials cited in the body of this report and the materials listed in **Exhibit C** of this report. I have also relied on my three decades of experience in designing, developing and testing packaging and working with packaging slack fill issues. My analysis is ongoing, however, and I reserve the right to supplement this report in view of any additional information produced in this case. I also reserve the right to use animations, demonstratives, enlargements of real exhibits, and other devices to illustrate my opinions at trial.

## IV.    SUMMARY OF OBSERVATIONS AND CONCLUSIONS

18.    From my analysis to date, including analysis of the complaint and products involved, I have made the following observations and opinions:

### Summary of Observations.

19.    Defendant packages its Six Star Pro Nutrition Pre-Workout Explosion Products in sealed non-transparent, or opaque, containers that do not allow consumers to view the contents inside. Therefore, the packaging "does not allow the consumer to fully view its contents." 21 C.F.R. § 100.100(a):

20.    Six Star has marketed its 7.91 oz. Pre-Workout Explosion Ripped product (UPC 3165671233) in a container sometimes referred to as a "32 ounce" container, referring to the roughly 32 fluid ounces capacity of the canister used for this product. The package stands at approximately 5.18 inches (131.58 mm) tall, including assembled container and closure, with a diameter of approximately 4 inches (101.38 mm). The fill level of the consumable "pre-workout" dietary supplement powder product contained in this canister is approximately 1.77 inches (44.96

5

mm) from the base of the container. Measuring from the base of the container up to the seal surface of its lid, approximately 64% of the container is comprised of empty space, or slack-fill.

21.    Iovate also markets its SixStar products in a smaller container which includes at least the following products and sizes: 5.91 oz., 6.51 oz., 7.41 oz., and 8.16 oz. of Six Star Pre-Workout Explosion and SixStar Pre-Workout Explosion Ripped products, detailed later in this document. This container stands at approximately 4.92 inches (125 mm) tall, including assembled container and closure, with a diameter of approximately 3.5 inches (89 mm). The container is filled with pre-workout powder approximately 1.5 to 2.19 inches (38.11 to 55.72 mm) from the base of the container. Measuring from the base of the container up to the seal surface of its lid, approximately 54% to 68% of the container is comprised of empty space, or slack-fill.

22.    Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. As set out in 21 C.F.R. 100.100, nonfunctional slack-fill is defined as the empty space in a package that is filled to substantially less than its capacity for reasons other than one of six enumerated safe harbor provisions.

23.    Defendant's 32 fluid ounce Product packaged in a so-called "32-fluid ounce" package contains approximately 64% of empty space which is substantially less than its capacity. Similarly, Defendant's Product packaged in a so-called "20-fluid ounce" package contains approximately 54% to 68% of empty space which is substantially less than its capacity.

24.    Based on my analysis, the Accused Products' packaging does not fit within any safe harbor. For example: (1) the slack-fill does not protect the contents of the packaging, as the product is not fragile because it is a fine powder; (2) Defendant's machines are used to produce several different sizes of products therefore, there is no reason that machines used for enclosing the contents of the package would require such a disproportionately sized container; (3) the slack-fill is not necessary to accommodate product settling, as fine powders do not settle to an extent that results in 64% to 68% of the container being empty; (4) the packaging does not perform a specific function other than housing the powder; (5) the packaging does not have "value which is significant in proportion to the value of the product" independent of housing the product, nor is the container used as part of the presentation of the product; and (6) the container does not need to be significantly larger than its fill to accommodate necessary labeling information, as there are several sized containers available for the Six Star Pro Nutrition Brand, as well as comparable products in various smaller containers produced by competitors.

25.    Defendant's 32 fluid ounce Product contains a serving scoop and two desiccant pouches marked "Pillow Pak." Defendant's so-called "20 fluid ounce" Product contains a serving scoop and one desiccant pouch. The excessive amount of slack-fill is not necessary for these objects to fit within the containers, as there is still excessive slack-fill even after they are included. Defendant could substantially fill the containers, or use smaller containers, and still be able to accommodate the serving scoop along with the desiccant pouches for both of these products.

26.    Other than housing the pre-workout powder, the serving scoop, and desiccant (aka "Pillow Paks,") the size and volume of the Accused Products' containers serve no other purpose. The substantial amount of slack-fill is nonfunctional, and in my opinion, there is no valid reason for selling a container comprising approximately 64% to 68% nonfunctional slack-fill other than to mislead the consumer.

27.    On information and belief, Defendant is selling and will continue to sell its Products using deceptive, misleading, and misbranded containers.

**Summary of Opinions.**

28.    The slack-fill included in the packaging of the Accused Products is non-functional, in that it is not required for:

   a.   product dispensing,

   b.   consumer ergonomics during use and storage,

   c.   product safety

   d.   retailer handling, distribution, theft deterrence, and merchandising

   e.   promoting package recycling, including recovery, sortation

   f.   incorporating required product label communication, including Drug Facts, Warnings, Manufacturer Contact Info, and UPC

29.    The packaging of the Accused Products is inconsistent with the general dietary supplement powder category, as they include a comparatively greater amount of functional slack-fill.

30.    The measured headspace or void above the consumable product in the Accused Products is inconsistent with competitive products with similar Net Weights. The slack-fill of the Accused Products exceeds that of the general competitive set of dietary supplement powders evaluated, based on my evaluation of several samples of the Accused Products and competitive products.

31.     While Accused Products' claimed Net Weights are identified on their packaging, in my opinion they are confusing and easily overlooked by consumers, given the quantity and presentation of information located near the weight claims on the packages' PDP (Principal Display Panel, or front label), and relatively small font size of net weight claim compared to other graphic elements, including numbers related to voluntary product attributes and claims not required by law.

32.     Transparent or translucent containers are available, which, when coupled with shorter or transparent labels, would provide an opportunity for consumers to see actual product fill level.

33.     Standardized or "stock" canisters and closures of smaller sizes are offered and used by numerous brand owners across the dietary supplement category

34.     The wide array of "stock" or standardized canisters provided Defendant with ample opportunity to adopt smaller, more appropriately sized canisters to accommodate the comparatively smaller volume of product they offered for sale.

35.     Defendant has failed to demonstrate that the Accused Products comply with any of the known Functional Slack-Fill safe harbors that would allow the excessive amount of headspace in the packaging of the Accused Products.  On the contrary, the non-functional slack-fill of the Accused Products represents outliers in the category of dietary supplement powders.

36.     Equipment, tactics, and processes exist and are routinely employed in the packaging industry which mitigate known settling issues associated with low bulk density products such as dietary supplement powder.  These options for mitigating potential slack-fill challenges were apparently ignored by Defendant.

37.     Defendant's Products' packaging meets the definitions of nonfunctional slack-fill under both California and federal law.

## V.     TECHNICAL BACKGROUND: THE PACKAGING INDUSTRY AND DIETARY SUPPLEMENT POWDER

39 .     The products in this case concern canisters of low-density dietary supplement powder.

40.     Packaging materials and systems are primarily used to (a) contain, protect, and dispense products, (b) communicate to consumers information about a product, and (c) help in marketing or selling the product.  The packaging industry today utilizes many materials and

formats, including rigid packaging such as glass and metal, in addition as plastic and fiber containers.

41.     These various packaging types are used for a wide variety of products for consumers, or what are commonly referred to as "consumer packaged goods ("CPGs")."  For example, milk and orange juice typically use multi-portion packaging that can be opened and resealed a number of times, allowing consumers to use the products over time rather than as a single serving.  Such containers that directly contain the consumable product are considered "primary packaging," and are designed for direct consumer use.

42.     The industry also offers "secondary packaging," which typically consists of cartons or cases used to contain and protect multiple units of primary packaging during warehousing, shipping and distribution.  Finally, there is "tertiary packaging," typically comprising of wooden pallets, plastic stretch film, and similar materials intended to unitize secondary packaging during warehousing, shipping and distribution.

### A.     Containers, Or Canisters.

43.     A canister, also known inside and outside the packaging industry as a jar, is a general type of container that is typified by a wide mouth or opening in relation to overall container width, and is generally cylindrical in shape, although many variations of canister shapes exist. They are a common package type for marketing relatively large quantities of product, usually products consisting of multiple servings.  Canisters can be made from a variety of materials, including certain plastics or polymers such as polyethylene (PE, including HDPE and LDPE), polyester (PET), polypropylene (PP), and other non-plastic materials such as fiber, glass, metal, and others.  In the case of plastic or glass, the containers can usually be made to be transparent or translucent, allowing consumers to see product contained inside, or opaque, making contents invisible to consumers.  This choice can depend on factors such as aesthetics, potential product sensitivity to degradation from UV light, and possibly other factors.  Fiber, composite, and metal canisters are typically opaque.

44.     Canisters have been used since at least first century in ancient Rome.  From the ninth to the 19th century, packaging, including canisters, slowly developed, and were mostly made from glass, metal or fiber.  Finally, by the 1940's, suitable polymers were developed for use with blow molded canisters, and today, canisters are a very common packaging platform used for products ranging from salty snacks to household chemicals to dietary supplement powders.

45.     HDPE (High Density Polyethylene) canisters are made through the extrusion blow molding (EBM) process, where a molten tube is extruded, enveloped by a mold set that clamps both parison ends closed, and inflates the plastic into the shape of the mold.  HDPE canisters can be made with either translucent "natural" (colorless) resin, or opaque (colorant added, typically including $TiO_2$ (Titanium Dioxide) as an opacifier), and virtually any custom color can be achieved.

46.     PET (polyester) canisters are made with an injection stretch blow molding (ISBM) process, where a test tube-like preform is injection molded typically in one machine, and the preform is re-heated, stretched, and blown into a mold the shape of the final container in another machine, referred to as a two-step ISBM process.  PET canisters can be made crystal clear, or can be colored in much the same manner mentioned for HDPE.

47.     Threaded canisters are typically designed to utilize standardized SPI (Society of the Plastics Industry) "finish" or thread sizes, such as SPI 89 mm-400 style, or SPI 110 mm-410 style, where the first number of the description (89 or 110, as examples) identifies the thread OD (outside dimension) in millimeters, and the second number corresponds to the thread height (400 signifies a shallow thread or closure "skirt" length, and 410, a long skirt).

48.     Threaded closures for canisters follow the same SPI convention, such that canisters and closures of the same standardized SPI identification will typically be compatible, and provide a reliable finish where threads can be expected to turn together smoothly, without binding, and without the skirt of a closure "bottoming out" onto the shoulder of the canister.

49.     As shown below, in the product category of dietary supplement powders, canisters tend to utilize SPI threaded finish sizes of 89 mm, 100 mm and 110 mm, primarily to allow consumers to fit their hand and measuring device, such as a scoop, inside the mouth of the container for measuring or dosing the powder product.

10



50.    Containers used by dietary supplement powder products generally range widely in volumetric capacity, from 8 fl.oz. to 128 fl.oz., as shown by the variety of products in the following image:



51.    Stock container volumetric sizes also generally range widely from 8 to 128 fl. oz., as shown by some of the offerings from well-known packaging distributors TricorBraun and Berlin Packaging, shown below:





### B.     Utensils, Or Scoops, Desiccants and Promotional Items.

52.     Utensils such as scoops are sometimes included in dietary supplement powders, enabling consumers to precisely measure product dosage.  Other promotional items may also be included, such as small product brochures or coupons.  Since these items occupy some minor volume of the container, consideration is normally given to how to efficiently include them within the package.  One method of mitigating the amount of space a hollow dispensing device requires is to "bury" the unit within the product, i.e. to fully or partially immerse the scoop below the powder product fill level, thereby filling the hollow scoop void with product and minimizing the void space it requires.  This tactic can be accomplished by manually inserting the scoop within the powder product, or by manually or automatically inserting the scoop into a partially filled container, and subsequently filling the remainder of the product over the scoop.  As shown below, other tactics such as integrating them to into an injection molded closure, or friction-fitting the scoop into the container neck, are examples of efforts to minimize the space these articles consume.

 

### C.     Availability Of Stock Packaging.

53.     Tooling or injection molds for such an array of components requires a considerable investment, and to defray such a large capital expenditure, several major injection molders, or suppliers, offer canisters in "stock" or "standard" formats.  Stock canisters and scoops are typically available to brand owners in standardized sizes directly from manufacturers or molders, or through a network of packaging distributors such as Berlin Packaging and TricorBraun.  Stock packaging

---

[2] https://www.aptar.com/products/food-beverage/neo/.

is usually designed and developed by a supplier and offered for sale and use across many end users, including CPG (Consumer Packaged Goods) brands.

54.     As mentioned earlier, stock canisters and closures are often modeled after industry leaders, which for the global and North American dietary supplement powder category might mean brands such as Muscle Milk, Optimum Nutrition, Cellucor and other brands.  Category leaders unofficially "set the bar" for canister sizes and shapes, meaning competitors typically follow suit with either similarly sized and shaped custom or stock components.

55.     Examples of widely available stock or "standardized" canisters suitable for dietary supplement powder packaging are shown below, including containers with roughly similar dimensions and fill capacities as the Products in issue in this litigation, as well as smaller containers.  These examples are a mere sampling of those container sizes, shapes and materials available, and are not intended to represent the vast array of options in the marketplace, which far exceeds those shown here.



**PET Plastic Straight Sided Jars with Ribbed Cap**

Item #: v2852B01

- Glass like appearance with durability of plastic
- Jars included PP ribbed caps
- Lightweight, shatter-resistant PET plastic construction

3

---

3 https://www.berlinpackaging.com/pet-plastic-straight-sided-jars-with-ribbed-cap/.

## 16 oz PET Plastic Straight Sided Jar 89-400 Neck Finish, Clear
39.5 Gram Weight, Continuous Thread - 35 per Case

4



## 16 oz Natural HDPE Plastic Round Jar - 89-400 Neck Finish
38.0 Gram Weight, Continuous Thread - Sold Individually

5

56.    It is also well known in the packaging industry that additional features, such as tamper evident seals like induction seals, as well as desiccants or materials used to maintain or promote dry bulk product are often utilized in products.  If utilized, brand owners must plan for the volumetric impact of these items.

57.    In summary, a range of canister materials and sizes exist, such that if a brand owner seeks a particular size or material, and does not wish to invest what can be considerable capital in a custom size, shape or material, they may source stock containers of a wide range of sizes from a number of suppliers and distributors offering them.

---

4 https://packagingoptionsdirect.com/16-oz-clear-pet-plastic-round-jar-89-400-neck-finish.

5 https://packagingoptionsdirect.com/16-oz-natural-hdpe-plastic-round-jar-89-400-neck-finish.

### D. Dietary Supplement Powder and Managing Settling of Low Bulk Density Products During Package Filling Operations.

58. Dietary supplement powder products are made from various sources and ingredients. The powders themselves typically are associated with low bulk density, which can result in some product settling during filling and shipping. However, because this is a well-known occurrence in the packaging industry, several methods of combating issues related to settling have been developed and widely adopted by many, if not most, dietary supplement powder manufacturers and brand owners. These include incremental filling (or use of multiple drops of product into the container), vibratory feeding of bulk product to the filling equipment and container, vertical drop compaction, and rotary charge compaction.

59. Traditional fillers drop the powder into the container underneath a single filler head. In progressive, or multi-head filling equipment, the filler drops the powder into the container in multiple doses, allowing the product to settle into the container during and between each dose. This is known to dramatically reduce container headspace, or non-functional slack-fill. Equipment of this type often utilizes "auger" filling devices where a helical screw turns to accurately dose product, and has become common for low bulk density products, being offered by well-known OEMs (Original Equipment Manufacturers) such as All-Fill, Spee-Dee Packaging Machinery, Barry Wehmiller, and others. Following is an image of such equipment:

 

6

---

6 https://www.spee-dee.com/rotary-fillers/; https://all-fill.com/equipment/automatic-machines/.

60.    Another common option to minimize headspace or non-functional slack-fill is the use of vibration in  pacakging equipment. The following image shows common locations of vibratory bulk settling in filling equipment, including hopper/s (1), pockets (2), and/or containers (3 & 4):



7

61.    In vertical drop pre-compaction, product is encouraged to settle, or "pre-compact" by dropping it vertically and stopping it, before it is finally dropped into the container.  In some applications, even greater compaction is achieved by dropping and stopping the product multiple times, space permitting.  The following is an example of equipment arranged this way:

---

7 https://www.spee-dee.com/rotary-fillers/.



62.     Rotary charge compaction also encourages pre-settling of product by using a number of cylinder-shaped chambers which receive the bulk product and rotate it a number of steps before dropping the compacted product into the container, much like a revolver firearm is pre-loaded with ammunition and rotates each round to the chamber for firing.

63.     There are other tools and tactics used by the packaging industry, such as "bottom-up" filling, where the container is lifted up to the fill head to minimize the distance dropped, minimizing air entrapment in the bulk product.  Using a combination of these well-established filling principals, packaging headspace for low bulk density products can be minimized, and non-functional slack-fill can be eliminated.

64.     In summary, there exist numerous, widely-available equipment and tactics by which headspace can be minimized in containers during filling operations, thereby eliminating non-functional slack-fill in low-density bulk powder products, including dietary supplement powders.

## VI.   RELEVANT LEGAL STANDARDS

65.     I am not a lawyer.  As noted above, however, and as demonstrated throughout the complaint, this legal dispute relates to alleged "Non-Functional Slack-Fill" that Plaintiff alleges Iovate's Products contained. The following reflects my understanding of some legal standards pertaining to slack-fill that are pertinent to my technical analysis.

66.     Both Federal and State Law Prohibit Nonfunctional Slack-Fill. Pursuant to California Business and Professions Code §12606(b): A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill. Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack-fill is the empty space in a package that is filled to substantially less than its capacity for reasons other than any one or more of the following:

(1) Protection of the contents of the package;

(2) The requirements of machines used for enclosing the contents of the package;

(3) Unavoidable product settling during shipping and handling;

(4) The need to utilize a larger than required package or container to provide adequate space for the legible presentation of mandatory and necessary labeling information, such as those based on the regulations adopted by the United States Food and Drug Administration or state or federal agencies under federal or state law, laws or regulations adopted by foreign governments, or under an industrywide voluntary labeling program;

(5) The fact that the product consists of a commodity that is packaged in a decorative or representational container where the container is part of the presentation of the product and has value that is both significant in proportion to the value of the product and independent of its function to hold the product, such as a gift combined with a container that is intended for further use after the product is consumed, or durable commemorative or promotional packages;

(6) An inability to increase the level of fill or to further reduce the size of the package, such as where some minimum package size is necessary to accommodate required labeling, discourage pilfering, facilitate handling, or accommodate tamper-resistant devices;

(7) The product container bears a reasonable relationship to the actual amount of product contained inside, and the dimensions of the actual product container, the product, or the

19

amount of product therein is visible to the consumer at the point of sale, or where obvious secondary use packaging is involved;

(8) The dimensions of the product or immediate product container are visible through the exterior packaging, or where the actual size of the product or immediate product container is clearly and conspicuously depicted on any side of the exterior packaging excluding the bottom, accompanied by a clear and conspicuous disclosure that the representation is the actual size of the product or the immediate product container;

(9) The presence of any headspace within an immediate product container necessary to facilitate the mixing, adding, shaking, or dispensing of liquids or powders by consumers prior to use;

(10) The exterior packaging contains a product delivery or dosing device if the device is visible, or a clear and conspicuous depiction of the device appears on the exterior packaging, or it is readily apparent from the conspicuous exterior disclosures or the nature and name of the product that a delivery or dosing device is contained in the package;

(11) The exterior packaging or immediate product container is a kit that consists of a system, or multiple components, designed to produce a particular result that is not dependent upon the quantity of the contents, if the purpose of the kit is clearly and conspicuously disclosed on the exterior packaging;

(12) The exterior packaging of the product is routinely displayed using tester units or demonstrations to consumers in retail stores, so that the customers can see actual, immediate container of the product being sold, or a depiction of the actual size thereof prior to purchase;

(13) The exterior packaging consists of single or multiunit presentation boxes of holiday or gift packages if the purchaser can adequately determine the quantity and sizes of the immediate product container at the point of sale;

(14) The exterior packaging is for a combination of one purchased product, together with a free sample or gift, wherein the exterior packaging is necessarily larger than it would otherwise be due to the inclusion of the sample or gift, if the presence of both products and the quantity of each product are clearly and conspicuously disclosed on the exterior packaging;

(15) The exterior packaging or immediate product container encloses computer hardware or software designed to serve a particular computer function, if the particular computer function to be performed by the computer hardware or software is clearly and conspicuously disclosed on the exterior packaging.

67. Further, the Federal Food, Drug, and Cosmetic Act (the "FDCA") prohibits the introduction of food products into interstate commerce that are misbranded. See 21 U.S.C. § 331(a). Relevant here, "a food shall be deemed to be misbranded if its container is so made, formed, or filled as to be misleading." 21 C.F.R § 100.100. Pursuant to 21 C.F.R. § 100.100(a): A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill. Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack-fill is the empty space in a package that is filled to less than its capacity for reasons other than:

(1) Protection of the contents of the package;

(2) The requirements of the machines used for enclosing the contents in such package;

(3) Unavoidable product settling during shipping and handling;

(4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumer;

(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g. a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or

(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other nonmandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

## VII.    DEFENDANT'S ACCUSED PRODUCTS EXHIBIT NON-FUNCTIONAL SLACK-FILL

68. As previously mentioned in Summary of Observations and Opinions, Defendant's accused products exhibit an excessive amount of non-functional slack-fill.  Following are details of this assessment:

### A.    Defendant's Six Star Pro Nutrition Pre-Workout Explosion Products Contain Nonfunctional Slack-Fill.

69. Defendant packages its Six Star 7.91 oz. Pre-Workout Explosion Ripped (UPC 3165671233) Product in a roughly 32 fluid ounce canister, and its 8.16 oz., 7.41 oz., 5.91 oz. and 6.51 oz. Six Star Pre-Workout Explosion Products (UPC's 3165670711, 3165671099) in a 20 fluid ounce canister, all of which are sealed, non-transparent, or opaque, containers that do not allow consumers to view the contents inside before purchasing and opening them. Therefore, the packaging "does not allow the consumer to fully view its contents." 21 C.F.R. § 100.100(a), as shown in the images of the Accused Products below:

 

70. The Accused Product's larger 32 fluid ounce container stands at approximately 5.18 inches (131.58 mm) tall, including assembled container and closure, with a diameter of approximately 4 inches (101.38 mm). The container is filled with pre-workout powder approximately 1.77 inches (44.96 mm) from the base of the container. Measuring from the base of the container up to its lid, approximately 64% of the container is comprised of empty space, or slack-fill.

71. The Accused Product's smaller 20 fluid ounce container stands at approximately 4.92 inches (125_ mm) tall, including assembled container and closure, with an outside body diameter of approximately 3.5 inches (89 mm).  Defendant's "20 fluid ounce" Product containers

are filled with 5.91 oz., 6.51 oz., 7.41 oz., or 8.16 oz. of pre-workout powder, which measures approximately 1.5 inches (38.11 mm) from the base of the container (for the 5.91 oz Product), 1.68 inches (42.55 mm) from the base of the container (for the 6.51 oz Product), 1.8 inches (45.65 mm) from the base of the container (for the 7.41 oz Product), and 2.19 inches (55.72 mm) from the base of the container (for the 8.16 oz Product). Measuring from the base of the container up to its lid, approximately 54% to 68% of Defendant's "20 fluid ounce" Products' containers are comprised of empty space, or slack-fill.

72.    Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein.

73.    As set out in 21 C.F.R. 100.100, nonfunctional slack-fill is defined as the empty space in a package that is filled to substantially less than its capacity for reasons other than one of six enumerated safe harbor provisions. Defendant's Products contain approximately 64% of empty space (for the 32 fluid ounce Product) and between 54% and 68% of empty space (for the 20 fluid ounce Product), which is substantially less than the capacity of both the 32 fluid ounce and 20 fluid ounce containers used by Defendant.

74.    In summary, Defendant's packaging for its Pre-Workout products does not fit within any safe harbor. For example:

(1) the slack-fill does not protect the contents of the packaging, as the product is not fragile because it is a fine powder;

(2) several different sizes of containers are widely available, including smaller containers and containers that are transparent or translucent; therefore, there is no reason that Defendant could not offer the Accused Products in appropriately-sized containers;

(3) the slack-fill is not necessary to accommodate product settling, as fine powders do not settle to an extent that requires 64% to 68% of the container be empty;

(4) the packaging does not perform a specific function other than housing the powder and accessories as described herein;

(5) the packaging does not have "value which is significant in proportion to the value of the product" independent of housing the product and accessories, nor is the container used as part of the presentation of the product; and

(6) the container does not need to be significantly larger than its fill to accommodate necessary labeling information, as there are several sized containers available for the Six Star Pro Nutrition Brand, as well as comparable products in various smaller containers produced by competitors and numerous smaller stock containers widely available to anyone, and an endless variety of smaller custom container options, as well.

75.     The containers used by the Accused Products contain a serving scoop and desiccant pouches marked "Pillow Pak."  The excessive amount of slack-fill is not necessary for these two objects to fit within the container.  Defendant could substantially fill the container, or use a smaller container, and still be able to fit the serving scoop along with the separate desiccant pouches. Further below is a detailed analysis of these points.

76.     Other than housing the pre-workout powder, the serving scoop, and desiccant pouches, the size and volumetrics of the containers serves no other purpose. The substantial amount of slack-fill is nonfunctional, and there is no valid reason for selling a container comprising approximately 64% to 68% nonfunctional slack-fill other than to mislead the consumer.

77.     On information and belief, Defendant is selling and will continue to sell its Products using deceptive, misleading, and misbranded containers.

**B.     Competitive Products In The Field Exhibit Less Headspace and Less Non-Functional Slack-Fill.**

78.     To compare headspace and slack-fill of other dietary supplement powder products, on November 1, 2021, I found and purchased 10 samples of various "Pre-Workout" dietary supplement products from two well-known retailers, CVS Pharmacy, and Walmart, both located in Livermore, California.    I also evaluated two additional samples provided to me by counsel from McGuire Law.  These products included:

| Product Image | Product Description | Product Net Wt. (ounces) | UPC |
|---|---|---|---|
|  | Six Star Pre-Workout Explosion Fruit Punch (provided by counsel from McGuire Law) | 8.16 | 3165670711 |
|  | Six Star Pre-Workout Explosion Ripped 33% Free Peach Mango (aka "32 fluid ounce. container," provided by counsel from McGuire Law) | 7.91 | 3165671233 |
|  | Cellucor C4 Sport Pre-Workout Blue Raspberry, (purchased from CVS Pharmacy Livermore, CA) | 9.5 | 1039002919 |
|  | Cellucor C4 Ripped Sport Explosive Energy & Cutting Formula- Arctic Snow Cone (purchased from CVS Pharmacy Livermore, CA) | 8.7 | 429510534 |

| | | | |
|---|---|---|---|
|  | Six Star Pre-Workout Explosion Fruit Punch (purchased from Walmart Livermore, CA) | 7.41 | 3165670711 |
|  | Six Star Pre-Workout Explosion Fruit Punch (w/ hang tag coupon, (purchased from Walmart Livermore, CA) | 7.41 | 3165670711 |
|  | Six Star Pre-Workout Explosion Ripped Watermelon (w/ hang tag coupon, (purchased from Walmart Livermore, CA) | 5.91 | 3165671099 |
|  | Six Star Pre-Workout Explosion Ripped Watermelon (Bonus Size, (purchased from Walmart Livermore, CA) | 6.51 | 3165671099 |

| | | | |
|---|---|---|---|
|  | Cellucor C4 Ultimate Pre-Workout Performance- Icy Blue Razz (purchased from Walmart Livermore, CA) | 6.77 oz | 4259511925 |
|  | Redcon1 Total War PreWorkout- Freedom Punch (purchased from Walmart Livermore, CA) | 14.6 oz | 1004457380 |
|  | ProSupps Dr Jekyll Signature Pre-Workout- Blueberry Lemonade (purchased from Walmart Livermore, CA) | 8.5 oz | 1825302919 |
|  | ProSupps Mr Hyde Signature Pre-Workout- Blue Razz Popsicle (purchased from Walmart Livermore, CA) | 7.6 oz | 1825302806 |

79.    My process for evaluating each sample utilized the following procedure:

a.) Measure Gross Wt. & record date code.

b.) Mark samples w/ Label & re-measure Gross Weight.

c.) Open & measure fill level (x3 locations) & total inner Height & Diameter (see images below, respectively).






d.) Reclose, lightly "tap" container three times, re-measure fill level (x3 locations).

e.) Entirely empty contents, tare scale, measure product net weight, package net weight, scoop and desiccant weights.

f.) Refill container with powder product only. Measure fill level. Calculate overall container volumetric capacity *(948.18 ml or 32.06 fl.oz. for "32 fl.oz." container and between 689.18 to 695.54 ml or 23.3 to 23.52 fl.oz. for "20 fl.oz." container)*, fill volume, headspace volume, and compare results.

g.) For the 32 fluid ounce. (7.91 oz) sample provided to me by counsel from McGuire Law, I conducted the procedure noted above, then conducted an additional test whereby I confirmed the calculated container volumetric capacity by conducting a physical fill capacity test, measuring the net weight of room temperature water filling the container, which, as expected, verified the accuracy of the calculated container volume for this sample at 948.18 ml +/- 1.5 ml (32.06 fl.oz. +/-0.051 fl.oz).

**Measurements and Calculations from above analysis included the following:**

80.    The following table summarizes the data, measurements and calculations regarding the products analyzed, including the Powder Product Fill Volume and the calculated package Slack Fill %:

| Product Image & UPC | Product Description | Product-Only Fill Volume vs. Estimated Total Container Volume (ml) | Sample Slack Fill % |
|---|---|---|---|
| 3165670711 | 8.16 oz. Six Star Pre-Workout Explosion Fruit Punch | 318.20/689.93 | 54% |

| | | | |
|---|---|---|---|
|  3165671233 | 7.91 oz. Six Star Pre-Workout Explosion Ripped 33% Free Peach Mango (aka "32 fluid ounce. Container") | 344.62/948.18 | 64% |
|  1039002919 | 9.5 oz Cellucor C4 Sport Pre-Workout Blue Raspberry | 340.17/645.14 | 47% |
|  429510534 | 8.7 oz Cellucor C4 Ripped Sport Explosive Energy & Cutting Formula- Arctic Snow Cone | 302.06/616.28 | 51% |
|  3165670711 | 7.41 oz. Six Star Pre-Workout Explosion Fruit Punch | 264.29/695.24 | 62% |

| | | | |
|---|---|---|---|
|  3165670711 | 7.41 oz. Six Star Pre-Workout Explosion Fruit Punch (w/ hang tag coupon) | 259.86/687.02 | 62% |
|  3165671099 | 5.91 oz. Six Star Pre-Workout Explosion Ripped Watermelon (w/ hang tag coupon) | 217.48/689.18 | 68% |
|  3165671099 | 6.51 oz. Six Star Pre-Workout Explosion Ripped Watermelon (Bonus Size) | 243.84/695.54 | 65% |
|  4259511925 | 6.77 oz Cellucor C4 Ultimate Pre-Workout Performance- Icy Blue Razz | 262.31/605.84 | 57% |

| | | | |
|---|---|---|---|
|  1004457380 | 14.6 oz Redcon1 Total War PreWorkout- Freedom Punch | 466.93/645.63 | 28% |
|  1825302919 | 8.5 oz ProSupps Dr Jekyll Signature Pre-Workout- Blueberry Lemonade | 293.42/619.69 | 53% |
|  1825302806 | 7.7 oz ProSupps Mr Hyde Signature Pre-Workout- Blue Razz Popsicle | 262.06/611.46 | 57% |

**Findings and Conclusions from above analysis included the following:**

80.     Based on my analysis, the Accused Products contain excess slack-fill, and product contents are not visible to consumers prior to purchasing those products.

81.     A smaller or transparent container would accommodate the product in the Accused Products and mitigate slack-fill issues. Product dispensing (manual use of scoop) ergonomics may dictate minimum opening diameter, such as 63 mm diameter, which are widely available; also shorter height containers with same or similar 89 mm diameter opening as the Accused Products are widely available—including stock containers requiring no new mold investment.

32

a. Also, clear and translucent containers are available and would enable consumers to see product fill level. Containers made from clear PET (polyester) have such qualities. For example, Cellucor C4 product evaluated (6.77 oz. Cellucor C4 Ultimate Pre-Workout Performance- Icy Blue Razz, UPC 4259511925) uses a clear PET canister of approximately 605.9 ml capacity, or approximately 36.2% less container volume than the 7.91 ml Accused Product.

b. If clear containers were used with clear or shortened labels (labels sized such that top of label is below or near to product fill level), consumers would be able to see fill level inside container. If product degradation from exposure to UV light penetrating transparent containers were a concern, there are inexpensive, food-grade resin additives called UV inhibitors that are widely available. I have utilized such additives in my role at The Clorox Company for protecting Hidden Valley Ranch Salad Dressing in PET bottles. One example of such an additive is offered by additive supplier Milliken (http://chemical.milliken.com/products/additives-UV-absorbers-PET-clearshield).

c. Another option is the use of "natural" (translucent) HDPE resin, like that used by milk jugs and many other food products. The Accused Products already use natural HDPE resin when blow molding their containers, but they are subsequently metalized below the neck, rendering them opaque and therefore disallowing consumers the ability to visualize the product fill level inside.

82.     Another opportunity to mitigate non-functional slack fill exhibited in the Accused Products is for Defendant to replace the excess headspace in the containers with additional product, and adjust their claimed net weight on label accordingly. Following is a summary of the analysis I conducted on the Accused Products to determine how much incremental available capacity their packages contain, both in terms of volume and incremental product net weight:

| Product Image & UPC | Product Description | Estimated Scoop and Desiccant Volume (calculated in ml)- average of | Total Volume of Current Product with "Buried" Scoop/Desiccant (calculated in ml) | Incremental Available Capacity of Package (assuming original scoop + |
|---|---|---|---|---|

33

| | | calculated volume from physical dimensions and measured volume | | double desiccant, calculated in grams) |
|---|---|---|---|---|
|   3165670711 | 8.16 oz. (**231 g**) Six Star Pre-Workout Explosion Fruit Punch | 35.2 | 354.69 | 233.3 |
|   3165671233 | 7.91 oz. (**224 g**) Six Star Pre-Workout Explosion Ripped 33% Free Peach Mango (aka "32 fluid ounce. Container") | 52.1 | 393.68 | 444.9 |
|   3165670711 | 7.41 oz. (**210 g**) Six Star Pre-Workout Explosion Fruit Punch | 37.3 | 304.99 | 290.3 |
|   3165670711 | 7.41 oz. (**210 g**) Six Star Pre-Workout Explosion Fruit Punch (w/ hang tag coupon) | 36.1 | 294.51 | 295.2 |

34

| | | | | |
|---|---|---|---|---|
| 3165671099 | 5.91 oz. (**168 g**) Six Star Pre-Workout Explosion Ripped Watermelon (w/ hang tag coupon) | 33.1 | 250.63 | 318.7 |
| 3165671099 | 6.51 oz. (**185 g**) Six Star Pre-Workout Explosion Ripped Watermelon (Bonus Size) | 32.9 | 277.42 | 309.2 |

83.     Clearly, based on the above analysis, there is considerable opportunity to increase the product amount filled into the containers used by the Defendant for the Accused Products, ranging from approximately an incremental 290.3 grams (10.24 ounces) to 444.9 grams (15.69 ounces), depending on product type, desiccant quantity, and container type.   While use of previously mentioned methods for minimizing container headspace may be needed to accomplish these fill weights, in my opinion they are achievable in the existing packaging utilized by the Accused Products.

84.     To further illustrate this opportunity, I conducted a simple and separate analysis of the 7.91 oz. Six Star Pre-Workout Explosion Ripped 33% Free Peach Mango, UPC 3165671233, in the "32 fluid ounce" container.   In this analysis, I emptied the entire contents of the 32 fl.oz. Product container (including all powder product, scoop and two desiccant pouches) into an empty Six Star 20 fl.oz. container.   The entire 7.91 oz. confirmed net weight of powder product, scoop and two desiccant pouches easily fit into the 20 fl.oz. container, with no product overflow and not remotely presenting and issue regarding scoop or desiccant pouches interfering with the vicinity of the closure or induction seal liner.   In fact, the resulting powder fill level was measured at a mere 62.71 mm measured from the 20 fl.oz. container's inner base, compared to that same

container's 120.71 mm total inner height. The product fill height measurement for the same product fill level in the 32 fl.oz. container was 44.96 mm from the base, as previously mentioned. So even this test using this smaller 20 fl.oz. package to hold the contents of the 32 fl.oz. package resulted in excessive, non-functional slack fill, reinforcing just how much opportunity Defendant had to either increase the fill amount in the 32 fl.oz. container, or reduce the container size used.

85.    Scoop height and the presence of desiccant packets are minimally impactful to container height/headspace requirements if inserted into the container strategically during product manufacture. In most cases, based on my experience, this can be accomplished through "incremental filling," i.e. use of multiple fill heads, each partially filling the container with product. Scoop & desiccant can then be inserted between incremental fill stations. Here, burying the scoop would minimize headspace by approximately 8.5 to 11 cc (the range of scoop capacity used in the Accused Products' "20 fl.oz." and "32 fl.oz." containers), and burying both the scoop and desiccant pack(s) would result in a more predictable fill level, meaning that the powder, scoop and desiccant would be a relatively consistent level in the container, such that potential concerns about random or inconsistent orientation of scoops or desiccant pouches inside containers would be mitigated and would not unpredictably impact headspace. This is further detailed below.

Following is a summary of the analysis I conducted on the Accused Products to determine the impact of "burying" the scoop and desiccant:

| Product Image & UPC | Product & Scoop Description | Estimated Scoop and Desiccant Volume (calculated in ml)- average of calculated volume from physical dimensions and measured volume | Total Volume of Current Product w/ "Buried" Scoop/Desiccant (calculated in ml) | Vertical Height of Product plus Scoop and Desiccant in Container: NOT Buried and BURIED (measured, mm) | Net Reduction in Vertical Height of Product plus Scoop and Desiccant in Container from Burying Scoop and Desiccant (mm) |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
|  31656707 11 | 8.16 oz. **(231 g)** Six Star Pre-Workout Explosion Fruit Punch; Scoop: 10cc 22.5x28x69.3mm | 35.2 | 354.69 | 87.6/62.11 | 25.49 |
|  3165671233 | 7.91 oz. **(224 g)** Six Star Pre-Workout Explosion Ripped 33% Free Peach Mango (aka "32 fluid ounce. Container"); Scoop: 8.5cc 25.89x23.82x57.26 mm | 52.1 | 393.68 | 63.71/51.36 | 12.35 |
|  3165670711 | 7.41 oz. **(210 g)** Six Star Pre-Workout Explosion Fruit Punch; Scoop: 10cc 22.4x28.3x69.4mm | 37.3 | 304.99 | 66.42/52.75 | 13.67 |
|  3165670711 | 7.41 oz. **(210 g)** Six Star Pre-Workout Explosion Fruit Punch (w/ hang tag coupon); Scoop: 11 cc 19.0x29.9x113.7mm | 36.1 | 294.51 | 65.81/51.67 | 14.14 |

| | | | | | |
|---|---|---|---|---|---|
| 31656710 99 | 5.91 oz. (**168 g**) Six Star Pre-Workout Explosion Ripped Watermelon (w/ hang tag coupon); Scoop: 8.5cc 25.3x23.7x75.7mm | 33.1 | 250.63 | 58.08/43.92 | 14.16 |
| 31656710 99 | 6.51 oz. (**185 g**) Six Star Pre-Workout Explosion Ripped Watermelon (Bonus Size); Scoop: 8.5cc 24.6x23.1x75.3mm | 32.9 | 277.42 | 63.51/48.41 | 15.10 |

86.    According to the measurements and calculations shown above, "burying" or embedding the scoop and desiccant in the product could reduce the overall container height by between approximately 12.35 mm to 25.49 mm (0.49 inch to one full inch).

a. It is noted that, according to the 11/3/21 deposition of Jeremy Allbright from Valentine Enterprises, Inc. ("VEI"), the entity that I have been informed currently manufactures Defendant's Pre-Workout Explosion products, VEI manually places the scoops and desiccants pack(s) into Defendant's Product containers (*see* deposition transcript pg. 41, lines 20-23).  In the same deposition, Mr. Allbright testified that he was not aware of VEI ever being asked by Iovate to bury the scoop or desiccant pack(s), but that doing so would not cost more (see deposition transcript pg. 27, lines 4-13): " . . . are you aware of Valentine ever receiving instructions requesting for the scoop and desiccant to be placed into the powder? A No, sir. Q Is that something that Valentine would be able to do if instructed to do so? A Yes, sir. Q Would that add any additional cost to the manufacturing process? A No, sir."

38

b.   Based on data and observations gathered in this analysis, the majority of the competitive set evaluated appears to bury their scoop and desiccant into the product. For example, none of the other six competitive products evaluated had scoops or desiccant packs exposed more than 15 mm above the fill line, and some were completely buried below the product fill line.  However, of the 12 products evaluated, the four with the most-exposed accessories (scoop and desiccant) were all Six Star products (all were exposed at least approximately 15mm above the product fill line).

87.    Smaller, more appropriately sized containers would still meet retailer conveyance guidelines around minimum size and weight requirements for handling of FMCG's at customer distribution facilities.  Fast-moving consumer goods (FMCG) include products such as dietary supplements.  Because of the volume of these products, most retailers require their suppliers (CPGs) to meet guidelines regarding minimum case dimensions and weights to enable the retailer to convey cases on automated conveyors and pick-and-pull operations.

88.    For example, WalMart published requirements for FMCG cases to have an O.D. (outside dimension) of at least 5 inches in Length x 3.5 inches in Width x 2 inches in Height, and weigh at least one pound case gross weight. (*See*  https://corporate.walmart.com/media-library/document/supply-chain-packaging-guide/_proxyDocument?id=00000173-a1ca-d3c5-a7fb-edcbf2400000.)

Page 189 of WalMart's requirements guide shows the minimum size requirements for "conveyable cases," as shown highlighted below:

Business Confidential | © 2021 Walmart Stores, Inc. The examples shown are for reference only.

Supply Chain Standards / General Requirements  |  189 // 338

# Conveyable and Non-conveyable Cases

**Conveyable Shipping Cases**
*(Vendor Pack Cases)*
Packaging and pallet formation must enable product to move successfully from the Supplier to the store shelf through the most efficient distribution process available. Where conveyors and/or robotic technology are used, the product will be clamped and/or conveyed to maximize operations within the distribution center.

Minimum *requirements*
5" L x 3.5" W x 2" H (minimum 1 lb.)
Maximum *requirements*
48" L  x 23" W x 30" H (maximum 60 lbs.)

**Conveyable Cases and Packaging**
• Cases are *required* to be free of protrusions on the outer packaging.
• Avoid round or irregular cases or vendor packs.
• Items are *required* to be tightly secured within their corrugated case or tray with minimal head space to prevent shifting during handling.
• It is *required* that hazardous and liquid material must be secure enough not to leak if the packaging breaks.
• A Suppliers internal barcode label should not be placed on the top of the case as it may interfere with the conveyor's scanning equipment and is *NOT ALLOWED* to cover any case ITF-14 barcode.

**Non-conveyable Cases**
While conveyable cases are preferred, not all cases and packaging can be conveyed in Walmart RDCs.

Some items are naturally too large or awkward to be conveyable; for example, bicycles, outdoor furniture, lawn mowers, large TVs, tires, garden tools, and long rugs. These items exceed the maximum dimensions and weight for conveyable cases but are acceptable non-conveyable items.

*The maximum height for a pallet pull is 85" without a pallet.* This is also the maximum height when creating a configuration for a pallet pull item. A pallet pull is an item that is shipped to stores as an entire pallet. *The maximum height for non-conveyable cases with a pallet is 90".*

89.    For very small items such as those measuring under 2 inches in height, meeting customer minimum case dimensions and weights may be challenging, given package size and case quantities (the number of consumer units per case).

90.    Since certain of the Accused Products at issue use the *smaller* so-called "20 fluid ounce container," (including the 5.91 oz., 6.51 oz., 7.41 oz., and 8.16 oz. sizes of Six Star Pre-Workout Explosion products), then we can use this smaller package to determine the minimum size of a typical multi-pack retail case.  For example, if a retail case of Accused Product contained just two primary packages of the Accused Products, it would still meet the "conveyable case" minimum case size required by Walmart.  This is because the dimensions of the Six Star so-called "20 fluid ounce" package measures 124.92 mm (or 4.92 inches) external height by 90 mm external width (or 3.5 inches) by 90 mm external width (or 3.5 inches).  Adding the industry standard 3.5 mm minimum thickness per wall of a typical "C" flute corrugated case, or +7 mm total additional width and +14 mm total additional height, plus the general guideline of at least +3 mm space in each the case length and width, and as much as +5 mm in height, brings the case O.D. (outside dimensions) to a minimum of 190 mm Length by 100 mm Width by 143.92 mm Height.  This converts to 7.48 x 3.98 x 5.67 inches minimum, for even a case containing just two items of the smaller 20 fluid ounce Accused Products.  Clearly, Walmart's minimum dimensional requirements of 5 x 3.5 x 2 inches (Length x Width x Height) for conveyable cases are easily met for the existing Accused Products.  However, Defendant could have used a smaller, more appropriately sized stock container without such gross nonfunctional slack fill, such as those widely available from distributors like Tricor Braun, Berlin Packaging, or others as mentioned previously.  For example, Defendant could have chosen a stock container such as TricorBraun's 16 fl.oz. "natural" (translucent) HDPE jar SKU# 028635, shown below, instead of the oversized jar Defendant currently uses, and coupled it with any of the various stock matching 89 mm closures such as Tricor Braun's stock SKU# 009762, also shown below.  In doing so, even a 2-item case count using this smaller, more appropriately sized package would result in a case OD measuring approximately 8 x 4 x 5 inches (Length x Width x Height), again easily still meeting Walmart's minimum dimensions for conveyable cases.  FMCG products such as dietary supplements often are shipped to retailers in case counts (number of containers per case) of at least 2 to 4 packs, thereby enabling smaller, more appropriately sized product packaging to be conveyable by retailers such as Walmart.

**Tricor Braun's 16 oz Natural HDPE Plastic Round Jar - 89-400 Neck Finish**



**SPECIFICATIONS**

| | |
|---|---|
| Neck Finish | 89-400 |
| Color | Natural |
| Material | HDPE |
| Capacity | 16 oz |
| Style | Jar |
| Shape | Round |
| Circumference | 11.75" |
| Total Height | 3.645" |
| Base Diameter | 3.734" |
| Country of Origin | United States |

**SKU# 028635**
**Availability: In stock**

38.0 Gram Weight, Continuous Thread

https://packagingoptionsdirect.com/16-oz-natural-hdpe-plastic-round-jar-89-400-neck-finish



**SPECIFICATIONS**

| | |
|---|---|
| Sub Style | Continuous Thread |
| Shape | Round |
| Color | Black |
| Style | Continuous Thread |
| Neck Finish | 89-400 |
| Country of Origin | USA |
| Material | PP |

**SKU# 009762**

https://packagingoptionsdirect.com/89-400-continuous-thread-unlined-black-plastic-closure

91.    As mentioned Walmart's minimum weight requirement for conveyable cases is one pound gross weight. The lightest of the six Accused Product I evaluated weighed 236.2 grams gross weight (or 8.33 ounces gross weight, for 5.91 oz Net Wt. Six Star Pre-Workout Explosion Ripped Watermelon (w/ hang tag coupon) UPC 3165671099). Two of these products would weigh approximately 472.4 grams gross weight, including just the primary packaging and product, and excluding the incremental weight associated with the corrugated case, or secondary packaging. Therefore, just two of the *smaller* Accused Products, (which again includes the 5.91 oz., 6.51 oz., 7.41 oz., and 8.16 oz. sizes of Six Star's Pre-Workout Explosion products) would meet Walmart's one-pound minimum weight requirement for conveyable cases. FMCG products such as dietary supplements often are shipped to retailers in case counts (number of containers per case) of at least 2 to 4 packs, thereby enabling the current Accused Products to be conveyable by retailers such as Walmart. By comparison, using the same smaller, more appropriately sized stock 16 fl. oz. HDPE container mentioned above from Tricor Braun, as just one example, would reduce the overall package gross weight by roughly 1 gram per primary package (39 g measured weight of Accused Product "20 fl.oz." jar vs. 38 grams for 16 fl. oz. jar), allowing a two-count case pack of smaller-sized packages to still easily meet the one pound minimum case weight requirement (470.4 grams not including secondary corrugated case, vs. the required 454 grams or one pound gross case weight).

92.    Based on this case size and weight evaluation, retailer dimensional and weight requirements do not present a challenge for case conveyance, and therefore case conveyability is not a valid reason as to why the Accused Products contain an excessive amount of Slack-Fill.

**Iovate's Accused Pre-Workout Products and comparison of leading competitor products.**

93.    Based on my measurements and calculations, the Accused Products have the highest "% Headspace," of the 12 "Pre-Workout" dietary supplement products evaluated. In fact, the five products with highest headspace % were all Six Star products, and all of those five products had greater than 60% headspace (ranging from 62% to 68%).

42

**Filling Equipment Variation.**

94.     Most filling operations involve some filler variation, whereby the filler dispenses slightly more or less of the product into the package.  This issue can be minimized through efforts by machine end-users to minimize variance through tight control over filling variables (temperatures, speeds, package positioning, etc), as well as rigorous PM's (preventive maintenance).  Also, containers must be designed to accommodate this filler variance, in order to prevent product from spilling over the top of the package when an especially large dose is delivered from filling process.

95.     Fill weight variations in the Accused Products was minimal, suggesting adequate control over filling equipment.  For example, the 20 fluid ounce containers of Defendant's 7.41 oz Six Star Pre-Workout Explosion Fruit Punch & 7.41 oz Six Star Pre-Workout Explosion Fruit Punch (w/ hang tag coupon) had product net wt. fill weights of 208.3g and 209.6g, respectively, or just 1.3g variation (0.6%) between these two samples of the same product and flavor, from different production runs.

UPC's: 3165670711 for both

Date Codes: 1982F09 & R8659, respectively

Expiration Dates: 7/16/2022 and 5/6/2023, respectively

% Headspace: 62% for both

If variation of filling equipment were the root cause of slack-fill issues in the Accused Products, one would expect to see wider variations in product net weights from such samples, as an increase of just 1.3 grams of product would not have a meaningful impact on the slack-fill of the Accused Products.  And while three of the six evaluated Iovate samples contained slightly less product than the claimed label weight (between 0.4g to 1.7g under label claim), again, the addition of just 1.7g to meet the label claim would have a negligible effect on the significant slack-fill in the containers.

**Bulk Density Variation.**

96.     Nearly all batch production processes, like those used to produce dietary supplement products like the Accused Products, have variations in density from batch-to-batch, flavor- to-flavor, and even within a given batch.  This variation is driven by several factors, including variability of raw materials, variances in temperature and humidity, blending speeds, filling equipment and other factors, and it is the goal of most reputable product processing and

filling operations to understand, quantify and control this variance.  Processes and packaging must be designed to accommodate this known variance in product batch density, in order to prevent, for example, an especially low-density batch from spilling over the top of the container, or as another example, to prevent an especially high bulk density from creating excessive headspace.

97.    As explained above, for the two Six Star products with the same UPC/Net Wt., the fill weight was consistent, being only 1.3g different from each other, or just 0.6% of actual fill weight variance.  Furthermore, the % headspace for these two products was a consistent 62%, despite different production codes (batches) and expiration dates.

98.    Continuing with the comparison of these same samples, if product batch density variations were the root cause of slack-fill issues in the Accused Products, one would expect to see wider variations in product net weights from such samples.  However, a 1.3g variation between these samples from completely different production runs, and therefore presumably different product batches, does not suggest that variation in product bulk density is at issue.

99.    It should be noted that during the 11/3/21 deposition of VEI representative Jeremy Allbright, it was mentioned that VEI does not test bulk density at various points in its production process, as one would expect to be done in modern dietary supplement product operations in order to understand, quantify and control bulk density variance.  *See* pg. 24, lines 2-6 "Q Mr. Allbright, would you say it's a standard practice from the products whose development you've overseen to have bulk density measured during the manufacturing process? A No, sir, not standard."

**High-Speed Filling and Package Size Requirements**

100.    FMCGs (fast moving consumer goods) typically require very fast production speeds (often 200+ CPM (containers per minute)) to produce quantities that will meet consumer and customer demand.  High-speed production often includes filling, capping, labeling, and case packing, and can also require minimum (and maximum) package sizes to facilitate material handling.  There is a limit to how small a package can be in order to be filled, capped, marked and case-packed at high speeds, and for powder products, a key factor of packaging dictating fill speeds is the neck diameter of the container, since product must pass through this opening to enter the package.

101.    However, in my opinion, the packaging used with Defendant's Accused Products, having 89 mm and 100 mm necks, do not approach this limitation for high-speed filling.  I have personally worked with packages that were filled at high speeds with comparatively smaller

dimensions than those of the Accused Products.  One example was at Merle Norman Cosmetics, where we filled/capped/labeled and case-packed lightweight makeup powders into jars with 63mm necks, at speeds in excess of 150 ppm (packages per minute).  At Nestlé, we filled lightweight coffee creamers into 70 mm-necked bottles at speeds far exceeding those at Merle Norman.

102.    For further examples of powder products being packaged into narrower containers, we can look to Defendant's own products.  I have access to Mintel Global New Products Database (GNPD), an online database chronicling the introduction of fast-moving consumer goods (FMCGs), or consumer packaged goods that have been launched at retailers globally since around 1996.  Mintel GNPD includes more than five million records from more than 80 countries, and captures product details such as the date the product first appeared, in which country, packaging information, ingredients, nutrition facts, distribution and pricing information. https://www.mintel.com/  Mintel GNPD has long been used by many brand owners to research products and product categories, and is considered by those knowledgeable in consumer packaged goods to be a reliable source for accurate product information.  According to Mintel GNPD, the Defendant launched a Pre-Workout dietary supplement in July 2019 in the U.S.A., called "Six Star Pre-Workout N.O. Fury."  Per Mintel, the package Iovate used for this launch had measurements of approximately 140 mm (5.51 inches) tall x 65 mm (2.56 inches) wide- (see Mintel GNPD Iovate Pre-Workout report).



## N.O. Fury Pre-Workout Dietary Supplement



| | |
|---|---|
| Record ID: | 6699011 |
| Company: | Iovate Health Sciences |
| Distributor: | Iovate Health Sciences |
| Brand: | Six Star Pro Nutrition Elite Series |
| Category: | Healthcare |
| Sub-Category: | Vitamins & Dietary Supplements |
| Market: | USA |
| Location of Manufacture: | USA |
| Import Status: | Not imported |
| Store Name: | Walmart |
| Store Type: | Mass Merchandise/Hypermarket |
| Store Address: | El Paso 79912 |
| Date Published: | Jul 2019 |
| Product source: | Shopper |
| Launch Type: | New Variety/Range Extension |
| Price in local currency: | $9.97 |
| Price in Euros: | 8.77 |
| Bar Code: | 631656602623 |

## Product Description

Six Star Pro Nutrition Elite Series N.O. Fury Pre-Workout Dietary Supplement is now available. The rapid release caplets are said to promote muscle pumps with 3000mg of nitric oxide matrix, are claimed to deliver a precise dose of arginine, which enhances nitric oxide levels, and are formulated for increased muscle hardness and fullness after just one dose. This product is designed for active men and women, strength trainers, all athletes, fitness enthusiasts and body builders, and retails in a pack containing 72 caplets and featuring Facebook, Twitter, Instagram logos, Leader in Science and 20 Years of Excellence awards, and Guaranteed Banned Substance Free and GMP certifications. The manufacturer states that this product is America's no. 1 selling pre-workout pill.

## Packaging Details

|  | Primary |
|---|---|
| Packaging Manufacturer | Custom Blow Moulding |
| Package Type | Jar |
| Package Material | Plastic HDPE |
| Label Type | Self-adhesive |
| Label Material | Foil |
| Closure Type | Cap |
| Closure Material | Plastic |
| Decorative Process | Flexo, Foil blocking, Self-colour |
| Production Methods | Extrusion blown plastic |
| Neck Finish | Screw-thread |
| Other features | Tamper-evident |
| Package Width (mm) | 65 mm (2.56 inches ) |
| Package Height (mm) | 140 mm (5.51 inches ) |
| Package Depth (mm) | 65 mm (2.56 inches ) |



103.    Defendant's use of this container demonstrates that smaller containers were known and available to Defendant, including containers that were both narrower, and of lower capacity. To illustrate this point, the container Defendant chose for its Six Star Pre-Workout N.O. Fury product is estimated to have a total volume of approximately 15.37 fl.oz. (454.6 ml), based on dimensions provided by Mintel. This would easily have been enough capacity for the so called "32 fluid ounce" canister, which contained 7.91 oz. of product and needed only 11.65 fl.oz. (344.62

ml) for product fill volume, still leaving ample room for a strategically placed scoop and desiccant pouch(es).

Additionally, the smaller container the Defendant chose for its Six Star Pre-Workout N.O. Fury product has a neck finish of approximately 63 mm diameter, only about 6 mm smaller than the neck finish of its 20 fl.oz. container, which in my opinion would still enable consumer-use of a scoop for product dispensing.

104.    Furthermore, this same container chosen by Defendant for its Six Star Pre-Workout N.O. Fury product, would have also easily accommodated the amount of product contained in its 20 fluid ounce Pre-Workout Explosion Product, which only needed from approximately 7.35 fl.oz. (217.48 ml) to 10.76 fl.oz. (318.20 ml) of capacity.   Defendant instead chose packaging with a total volume of approximately 23.33 fl.oz. (689.93 ml) for the Accused Products in the smaller, so-called "20 fl.oz." container.

105.    Furthermore, Defendant's choice of the Six Star Pre-Workout N.O. Fury product container included, per Mintel, the use of HDPE resin, which, as noted above, can be made to be uncolored "natural" or translucent, similar to that used by most milk jugs.  However, based on the images from Mintel, Defendant chose to use an opaque, colored version of this resin, obscuring the consumer's view of the product contained therein, consistent with their choice of container resin for the Accused Products at issue in this case.

**Obscure Net Weight Label Claim.**

106.    Certain required information, such as claimed net weight, is required to be communicated in font sizes of at least a minimum size.  The purpose of this is to enable consumers to readily determine package contents.  After reviewing the product net weight label claims on the cited examples of the Accused Products, it is my opinion that the product's "busy" PDP (principal display panel, or front label) obscures the products' label weight declaration.

107.    While the Accused Products have net product weight identified on the front labels, it is relatively small, obscure and, in my opinion, easy for consumers to miss.  The net weight claim is further confused by other claims with comparatively larger fonts, including "number of servings," "ingredient claims," "bonus claims," etc.

Specifically, the Accused Products "Net Wt Claim" font size measurements are, for example, on the 32 fluid ounce Six Star Pre-Workout Explosion Ripped container containing 7.91

oz of product (Counsel Provided Sample 32 fluid ounce): "Net Wt" = 2.55 mm tall font; "Serving Size" = 2.67 mm font;

By comparison, the Ingredients listing on the same label panel measures 4.26 mm; the "Bonus claim" measures 2.73 mm.  Other Six Star Products also use same/similar font sizes for various elements.  Images of the front PDP label are shown below:









 

### Retail Pilfer Resistance

108.    Nearly all retailers have a policy regarding minimum dimensions for primary packaging (the package directly containing the consumable product), particularly for products of a certain price point.  Packages not meeting these requirements are required to use "secondary" packaging: typically a larger carton, thermoform, blister card, or other means to present the package in a larger format that will deter concealment and theft at retail.  The Accused Products "Pre-Workout" dietary supplements, even if packaged in smaller containers with appropriate headspace, easily meet minimum package size to deter pilfering at retail stores.

### Retailer Merchandising Requirements

109.    Retailers sometimes have "shelf sets" or merchandising units which have a standardized width and height, and may even require a minimum width and depth dimension to ensure packages remain upright on shelf, don't topple over, and so that a certain amount of product will fit on shelves.  These are sometimes gravity-fed, or even spring-loaded merchandising units with rigid "lane dividers" separating various brands and product offerings.  In my opinion, the Accused Products, even if packaged in smaller packaging with appropriate amount of headspace, would not be subject to retailer merchandising requirements dictating the use of a packaging of a minimum size, or with the excessive slack-fill contained therein.  In fact, images of a retail shelf set provided by Iovate shows no rigid lane dividers or merchandising units, shelf height or width

restrictions that would require the package size they have chosen for the Accused Products. These images are shown below:





CONFIDENTIAL - ATTORNEYS' EYES ONLY

IOV_000696



CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    IOV_000697

**Adequate Label Space for Required Label Communication** (Drug Facts, Warnings, Manufacturer Contact Info) **& UPC**

110.    Most dietary supplement products must comply with FD&C requirements regarding on-pack communication of specific info, which has a minimum font size and location. This required on-pack communication includes product safety warnings, active ingredients, usage instructions, manufacturer contact info, product net weight, and more.  In addition, retailers require a unique UPC to identify the specific product and for retail checkout scanning purposes.  The UPC has specific requirements in terms of size and location.   In combination, these on-pack communication requirements require a relatively small package surface area when compared to the overall available label area.  In my opinion, the Accused Products, even if in smaller package with appropriate headspace, would easily allow inclusion of the required information.  To determine this, I measured, as examples, the required information on the 32 fluid ounce Six Star Pre-Workout Explosion Ripped Peach Mango product, and the 20 fluid ounce Six Star Pre-

Workout Explosion Fruit Punch Accused Products "back" labels, images of which are shown below, respectively:

 

111.    The "Supplement Facts, etc." area measurements were as follows:

32 oz Six Star Pre-Workout Explosion Ripped Product (Counsel-Provided Sample 32 fluid ounce):

> 84.5 mm tall x 78.5 mm wide, or 66.33 sq.cm vs. total label space of 447.2 sq.cm for this product.

20 fluid ounce Six Star Pre-Workout Explosion Product (Counsel-Provided Sample):

> 74.5 mm tall x 72.5 mm wide, or 54 sq.cm vs total label space of 354.5sq.cm for this product.

**Minimum Size Requirements for Recovery and Recycling.**

112.    Based on my experience, the minimum package size required for recovery of empty, used packaging by most MRFs (Material Recovery Facilities) for recycling purposes is 2 inches (50.8 mm) in each dimension (Length, Width, Height).  The Accused Products are at least 3.5 inches (89 mm) in their smallest (diameter) dimension.  Therefore, the Accused Products easily meet size requirements for recovery and recycling, and would still meet those requirements if products were packaged in appropriately sized container with less headspace.  For example, Defendant could have chosen a stock container such as TricorBraun's stock 16 fl.oz. "natural"

53

(translucent) HDPE jar SKU# 028635, instead of the oversized "20 fl. oz." jar Defendant currently uses.  As shown below, the dimensions (3.734 inches diameter x 3.645 inches height) of this smaller, more appropriately sized container would still easily meet the 2 minimum dimensions required for recycling and recovery at most MRFs.  Besides being more appropriately sized and thereby reducing non-functional slack fill, and allowing consumers to see the fill level of the product before purchase, the translucent (semi-transparent) HDPE resin material used to manufacture this stock container would also be considered more readily recyclable than the opaque, metalized HDPE container chosen by the Defendant for the Accused Products.

**Tricor Braun's 16 oz Natural HDPE Plastic Round Jar - 89-400 Neck Finish**



**SPECIFICATIONS**

| | |
|---|---|
| Neck Finish | 89-400 |
| Color | Natural |
| Material | HDPE |
| Capacity | 16 oz |
| Style | Jar |
| Shape | Round |
| Circumference | 11.75" |
| Total Height | 3.645" |
| Base Diameter | 3.734" |
| Country of Origin | United States |

SKU# 028635
Availability: In stock

38.0 Gram Weight, Continuous Thread

https://packagingoptionsdirect.com/16-oz-natural-hdpe-plastic-round-jar-89-400-neck-finish

C.    **Consumer Behavior And Understanding Of The Accused Products.**

113.    Based on my experience, consumers consider and rely on several factors when deciding to purchase a product, including the Accused Products, including the dimensions and size of the product container.

114.    Consumers would be unaware that Defendant's Product contained nonfunctional slack-fill because of the opaque nature of the container and the representations made by Defendant concerning the deceptively and needlessly large dimensions and size of the containers.

115.    Such representations made by Defendant are deceptive in relation to how much pre-workout powder is actually contained within the containers of the Accused Products. Reasonable consumers normally rely on representations made on, or by, product containers and attach importance to whether the product is misbranded, such as containing nonfunctional slack-fill.

116.    Based on the size of the Accused Products' containers, a reasonable consumer would expect the pre-workout powder to be filled closer to the container's capacity. However, the majority of the containers consist of nonfunctional slack-fill.

117.    On information and belief, consumers are detrimentally relying on Defendant's representations when making purchasing decisions and are being misled by the substantial amount of nonfunctional slack-fill in the Accused Products. Consumers who purchased the Accused Products did not have a reasonable opportunity to view the quantity of the contents contained within the Products' packaging.

118.    The information that Defendant provides about the quantity of contents within the container on the package labeling, such as the net weight or serving disclosures, does not enable a consumer to form a meaningful understanding about the quantity of contents contained within the container in comparison to the size of the container itself.

119.    Prior to the point of sale, or the consumer opening the Product, the packaging prevents visual or audial confirmation of the contents of the Product.

120.    The opaque packaging prevents a consumer from observing the contents before opening. Shaking the Product before a purchasing decision would still make it impossible for a consumer to discern the presence of any nonfunctional slack-fill and would not educate a consumer to the extent to which they are misled.

121.    This conduct by Defendant threatens consumers, as well as competing companies who do not participate in such unlawful practices, by using intentionally deceptive and misleading containers that reduce consumer choice.

## VIII.  CONCLUSION

122.    I conclude that Defendant packages its Six Star Pro Nutrition Pre-Workout Explosion Products in sealed non-transparent, or opaque, containers that do not allow consumers to view the contents inside. Therefore, the packaging "does not allow the consumer to fully view its contents." 21 C.F.R. § 100.100(a).  I further conclude that Defendant's 32 fluid ounce Product packaged in a so-called "32-fluid ounce" package contains approximately 64% of empty space which is substantially less than its capacity. Similarly, Defendant's Product packaged in a so-called "20-fluid ounce package contains approximately 54% to 68% of empty space which is substantially less than its capacity.

123.    Based on my analysis, the Accused Products' packaging does not fit within any safe harbor.  The excessive amount of slack-fill is not necessary for these objects to fit within the containers. Defendant could substantially fill the containers, or use smaller containers, and still be able to accommodate the serving scoop along with the desiccant pouches for both of the Accused Products. Other than housing the pre-workout powder, the serving scoop, and desiccant (aka "Pillow Paks,") the size and volume of the Accused Products' containers serve no other purpose. The substantial amount of slack-fill is nonfunctional, and in my opinion, there is no valid reason for selling a container comprising approximately 54% to 68% nonfunctional slack-fill other than to mislead the consumer.

124.   On information and belief, Defendant is selling and will continue to sell its Products using deceptive, misleading, and misbranded containers.

My analysis is ongoing.  I reserve the right to supplement my report in view of additional documents or testimony, including any additional testimony from Defendant.

56

Executed this 19th day of November, 2021.

Respectfully submitted,

_____

Glenn May

# Exhibit A

**Glenn May**
683 Vivian Dr.
Livermore CA 94550
cell 925.353.4543    propac@rocketmail.com

## EXECUTIVE SUMMARY

❖ Proven contributor and collaborator with 30 years of packaging experience and achievements in innovation and development of materials and equipment, packaging design and development, sustainability and intellectual property management.
❖ Extensive experience in packaging development, sourcing and consulting for large and small CPG's and suppliers of packaging and packaging machinery for Food, Beverage, Alcohol, Cosmetics, Personal Care, Pet Care, Home Care, Automotive, Nutraceutical & OTC, Electronics, Technology, and other categories.
❖ Senior leadership positions in multiple successful, fast-paced start-up companies, including Method Inc. and Ecologic Brands. Successfully developed teams, processes, and supplier network focused on creating value through market-winning packaging and developing our customer base. Highly capable as a hands-on, individual contributor, as well.
❖ Significant accomplishments in consumer-focused, innovative product development, including commercialization of several highly successful, category-leading and world-first packages, materials and machinery; Awarded several patents and industry recognition including being a Certified Packaging Professional (CPP) by the Institute of Packaging Professionals (IoPP).
❖ In-depth experience with many packaging and product types, processes, suppliers, and packaging platforms including:

| | | | |
|---|---|---|---|
| Bottles (SBM, EBM, IBM) | Paperboard & Corrugate | Films, Labels, Laminates | Molded Fiber |
| Injection Molding, Thermoform | Closures (dispensing, liners) | Tubes, Pouches, Susceptors | Glass (blow & pressed) |
| Metals (drawn aluminum, steel) | Decoration (flexo, gravure, litho) | Filling (aseptic,counter-pressure) | Capping, Accumulation, OEE |
| Sustainability- 3R's, GHG, etc | Case Packing/Palletize/Distrib | Molds & Tooling | Secondary/Tertiary Pkg |
| Suppliers (Domestic & Int'l) | Project Mgmt & Patents | Testing (ISTA, ASTM, DOE, compat) | Sustainability/Environmental |
| Regulatory (cGMP, FDA, FFDCA, 21CFR, ISO 11607, Annex 13, TTB, AIB, IMS, OTC, CRP) | | Custom Equipment Development | Cold Chain Distribution |
| Expert Witness, SME, Patents | Sales & Business Development | Package & Product Design | Shelf Life, Child Resistance |

## PROFESSIONAL EXPERIENCE

**Owner** *October 2008 to Present*
**PROPAC CONSULTING** (*PACKAGING DESIGN AND DEVELOPMENT FOR GPG PRODUCTS*), *LIVERMORE, CALIFORNIA.*
- Providing fast and effective solutions for all types of packaging and product challenges including innovation, technical support, materials optimization, sales and business development, supply chain development, mold and equipment design and development, process development, supply chain development, and cost savings.
- Successful consulting support including:
    o Expert Witness- numerous cases involving Intellectual Property (Utility Patents, Design Patents, Trade Dress), Consumer Packaging for Beverages, Alcohol, Machinery, Chocolate & Confections, Soap and Personal Care, Product Liability, Dispensing Closures, Supplier-Customer Responsibility Litigation, Depositions, Expert Reports, and more.
    o Columbus Foods (MAP and extended shelf life packaging, Club stores formats, FFS, etc)
    o Plenty Ag (hydroponic produce packaging, extended shelf life, proprietary designs, microperforations)
    o CarbonLITE recycled PET resin
    o Ecologic Brands (molded fiber bottles from recycled materials with applications in food, beverages, wine, nutraceuticals, etc),
    o Pendulum Therapeutics
    o Grove Collaborative (home products).
    o PepsiCo Products including Quaker, Frito-Lay, and other brands and products.
- Experience with virtually all types of packaging materials, components, and equipment in nearly all product categories and applications, including food, beverage, cosmetics and personal care, home care, nutraceuticals, pet care, wine/beer/spirits, and beyond!

## Group Manager & Associate Research Fellow
*March 2016 to 2020*
**THE CLOROX COMPANY**, *CLEANING PRODUCTS DIVISION* (*CLOROX, PINESOL, LIQUID PLUMR, 409, TILEX, PRODUCTS*) *PLEASANTON, CALIFORNIA.*
- Leading technical packaging and product innovation, sustainability, cost savings, and regulatory compliance (Child Resistance, How2Recycle, etc), for over $3Billion annual product sales
- Manager and key team member driving development of people (established new onboarding and training programs), supplier connections (discovered and implemented new key injection and blow molding suppliers), materials reduction (identified and implemented over $4M cost savings/year), Child Resistance compliance (established new SOP for development, testing and documentation), technology (patent pending for novel dispensing closures), and extensive work with packaging equipment and systems, tools and processes (Troubleshooting, Root Cause & Corrective Action, OEE, FEA, SAP and Product Data Management of packaging specifications, BOMs and document change control).

(Continued on page 2)

(Continued, page 2)

# Glenn May
925.525.0655 propac@rocketmail.com

## Chief Technical Officer
*May 2011 to August 2015*

ECOLOGIC BRANDS INC, (COMPOSITE BOTTLE DESIGN & MANUFACTURING) OAKLAND, CALIFORNIA.

- Drove all aspects of Research and Development, including packaging design & development, form-fit-function, COGs optimization, equipment specifications & development, and production site optimization/OEE, IP/patent strategy and filings, etc.
- Successfully developed and commercialized numerous first-ever packaging formats and equipment related to "bag-in-bottle" for several product categories such as wine (Paperboy brand), laundry detergents (Seventh Generation, Safeway, etc), protein powder (Body Logix by The Winning Combination), and pet care products (all-fiber Nestle-Purina Pro Plan containers and closures).
- Developed highly customized equipment for pulp molding, pouch making and assembly applications for internal manufacturing, and for sale to customers.
- Regular presentations and interaction with Board of Directors, investors, customers and industry seminars regarding technology, product development strategy, IP and other key areas.

## Director of Packaging Technology
*July 2008 to May 2011*

CONSTELLATION BRANDS US, SAN FRANCISCO, CALIFORNIA.

- Responsible for all aspects of technical packaging for all wines made in, imported into, and exported from, the USA.
- Headed packaging development at 9 bottling sites, with operations involving high speed glass bottle filling (bulk & re-shippers, still wine & sparkling, all sizes), Bag-in-Box filling, PET bottle & Tetra Pak aseptic packaging, etc.
- Led high performance department of 10 with responsibilities including:
  - Managing all technical changes to components, including testing, qualification, TTB (Tax & Trade Bureau) compliance.
  - Creating packaging for over 600 sku's for domestic, import and export business.
  - Drive OEE (Overall Equipment Efficiency) improvements from 40-65% to over 60-90% by reducing equipment downtime, improving production speeds, and improving quality.
- COGs reductions of over $4MM annually, due to materials savings, equipment investments, improved operational efficiencies.

## Sr. Director, Engineering & Packaging Development
*February 2005 to June 2008*

METHOD PRODUCTS INC. (HOME CARE AND PERSONAL CARE PRODUCTS), SAN FRANCISCO, CALIFORNIA.

- Created Engineering & Pkg Development team of six direct reports, established processes and procedures which:
  - Were key to company's 30% to 100% annual growth
  - Created exceptional, award-winning packaging and products starting with 25 sku's in 2004 to over 300 in 2008
  - Improved speed-to-market (from 9 mos down to 6 mos) and reliability (eliminated 3 leaking closure-bottle systems).
  - Environmental accomplishments included: first 100% PCR PET bottles, first recyclable laminate film, CARPP Law compliance, and several others
  - Implemented Engineering & Packaging software, including SolidWorks and CAPE and TOPS for unitization
- Hands-on execution of major projects and initiatives, including laundry detergent dosage and dispensing, cleaning tools development.

## Project Leader
*January 1999 to February 2005*

THE CLOROX COMPANY, SPECIALTY PRODUCTS DIVISION (FOOD, CHARCOAL, CAT LITTER, INSECTICIDES, AUTO (STP AND ARMOR ALL) AND PROFESSIONAL PRODUCTS, PLEASANTON-WALNUT CREEK, CALIFORNIA.

- Managed team that executed 45 major projects over two years, including the successful launch of 20+ new items and cost savings in excess of $4MM.
- Key team member for startup of new Kingsford international production facilities in China and Brazil, delivering critical new capacity to fuel business growth..
- Successfully managed group of five direct reports across several business units. Managed $1.5MM annual department budget.
- Promoted from Sr. Pkg Eng to Research Associate, then to Project Leader.
- Led cross-functional team on reduction of packaging-related unsaleables. Numerous improvements implemented on Cat Litter, Charcoal and Automotive (STP fuel treatment and ArmorAll) packaging saving over $2.5MM annually.
- Led team in launching innovative Easy Squeeze inverted dressing package with custom flip top closure and unique dispensing valve. Awarded U.S. Patent, IoPP's AmeriStar "Best of Food Category" and WPO's WorldStar 2001 award.
- Successfully led packaging & equipment development for Hidden Valley Single Serve product. Managed packaging sourcing and testing, design, purchase and manufacture of custom packaging equipment; launched in five month. Received recognition from Division General Manager for efforts and leadership.
- Provide leadership and expertise on emergency bases for leaking Clorox Disinfecting Wipes pouches. Successfully utilized DOE (Design of Experiment) to identify key factors, root causes and corrective action. Formally recognized by senior management for preserving original launch date.

(Continued on page 3)

(Continued, page 3)
# Glenn May
925.525.0655   propac@rocketmail.com

**Manager, Packaging and Operations**                    *February 1994 to January 1999*
*NESTLÉ CHOCOLATE & CONFECTIONS AND PETCARE DIVISIONS, GLENDALE, CALIFORNIA.*
- Managed projects involving the development, testing, and implementation of over 25 new packaging concepts annually for retail and industrial products.  Improved COGS for over 65 additional items, resulting in over $3MM savings/year.
- Selected as Trainer for Nestlé Quality Initiatives Problem Solving course.  Promoted from Asst. Mgr. to Manager.  Received two *Nestle Very Best* awards for *Pretzel Flipz* VFFS and HFFS pouches, patented candy dispenser, susceptors, and Club Store packaging project management.  International work on packaging taint/off-flavor issues.
- Achieved substantial cost reductions of cases, bags, cartons, and wrappers in excess of $450M annually through leveraging supplier resources and capitalizing on new technologies.
- Managed Petcare packaging projects personally reducing packaging costs in excess of $275k annually, assisting in additional $1.5MM.  Designed and implemented innovative "valve" and integrated handle into petfood bag to satisfy key consumer requirements.
- Valuable experience in can filling, seaming, and thermal processing, flexible films, rigid plastic containers, multi-wall bags, tray packing, folding cartons, equipment, microperforations, and corrugated packaging.  Promoted from Supervisor to Asst. Mgr, then to Manager.  Received *Nestlé Spirit Award* for implementing network pallet program for Logistics group.

**Packaging Engineer**                    *June 1992 to February 1994*
*MERLE NORMAN COSMETICS, LOS ANGELES, CALIFORNIA.*
- Designed and implemented myriad of custom tubes, cartridges, compacts, jars, and bottles, including re-usable packaging.
- Daily immersion in in-house injection molding facility and filling/assembly plants.  Experience with filling, capping, accumulating and sealing liquids, powders, and solids.  Extensive interaction with quality control methods and standards.

**Packaging Intern**                    *May 1991 to September 1991*
*COMPAQ COMPUTERS, HOUSTON, TEXAS.*
- Laptop computer and software packaging design, testing, development and commercialization, as well as minimizing damage from shock, vibration, ESD (electrostatic discharge), etc.

## E D U C A T I O N

| Bachelor of Science, Packaging Science | FDA/FPI-Certified, Food Processing | CPP-Certified (Certified Packaging Professional) |
|---|---|---|
| **Michigan State University**, East Lansing, Michigan | **University of California, Davis**, California Container Closure and Thermal Processing 1995. | **Institute of Packaging Professionals (IoPP)** |
| Completed Technical and Managerial options. Grad 1992. | | |

## A C T I V I T I E S  A N D  A W A R D S
**Executive Board Member, MSU School of Packaging Alumni Association** 2002 to 2005

### Speaking Engagements
Universal Design Conference, Michigan State University, East Lansing MI, June 2004: Hidden Valley Easy Squeeze silicone valve inverted package.
Brand Identity & Package Design Seminar ("Fuse"), April 2005 in New York City: design and transforming low-growth categories through Innovative Packaging.
CMA Annual Meeting (Closure Manufacturers Association), April 2007, Phoenix: "Closures in the Value Chain."
Brazilian Packaging Association: Design Conference, November 2007, Sao Paulo, Brazil, Key Notes Speaker: Pkg Design Impact on product and category growth.
Sustainability in Packaging Conference (Intertech Pira), March 2008, Orlando FL: sustainable packaging and impact of design on branding.
IoPP Transport Packaging Committee, "Door to Door Journey of Wine," Feb 2010, Webinar: wine packaging design, incoming QC inspections of packaging components, critical attributes, high speed production challenges.
Cleaning Products Conference, "Thinking Outside the Box", October 2012 in Richmond, VA for American Cleaning Institute.
ISRI (International Scrap Recyclers Institute), 2019, Los Angeles Convention Center, "Packaging Performance and Recyclability"

(Continued, page 4)

# Glenn May

925.525.0655    propac@rocketmail.com

**Professional Recognition**

1. 2001 IoPP AmeriStar Best of Food Category Packaging Award, (HV Easy Squeeze Inverted Bottle w/ silicone valve)

2. 2001 WordStar Award (HV Easy Squeeze Inverted Bottle w. Silicone Valve)

3. Clorox R&D 2004 "Certificate of Recognition for Outstanding Performance" on project Viper (Redesigned Litter Pails).

4. Awarded US Patent D471,462 for HV Easy Squeeze Inverted Bottle w. Silicone Valve.

## Container for salad dressing or the like



US • USD471462S1 • Glenn P. May • The Clorox Company

Priority 2001-09-04 • Filed 2001-09-04 • Granted 2003-03-11 • Published 2003-03-11

The ornamental design for a container for salad dressing or the like, shown and described.

5. 2008 IoPP Ameristar for Method molded bamboo fiber packaging used with omop cleaning tools and components.

6. Awarded US Patent USD425411S for novel confection dispensing package while at Nestle

## Candy dispenser

US • USD425411S • Glenn P. May • Nestec S.A.

Priority 1999-01-25 • Filed 1999-01-25 • Granted 2000-05-23 • Published 2000-05-23

The ornamental design for a candy dispenser, as shown and described.

7. Awarded US Patent for omop cleaning tool design (unique curved handle and functionality).

## Mop



US AU CA • USD579165S1 • Glenn May • Method Products, Inc.

Priority 2007-03-21 • Filed 2007-12-26 • Granted 2008-10-21 • Published 2008-10-21

We claim the ornamental design for a mop, substantially as shown and described.

8. Received 2 utility patents on Ecologic Brands packaging components (load-bearing telescoping lid and equipment patent)

## Containers for particulate materials



WO EP US • US20170021995A1 • Glenn May • Eco.Logic Brands Inc.

Priority 2013-10-02 • Filed 2016-03-30 • Published 2017-01-26

Containers for holding particulate materials are provided. The containers may be formed from molded pulp. The containers may included molded pulp shaped or threaded features formed integrally on the container that may aid in providing closure to the device. The containers may optionally include a …

9. 2015 AmeriStar Winner of "Best in Category" for Ecologic Brands Nestle-Purina ProPlan Cat Litter molded fiber containers

# REFERENCES

Excellent references provided upon request.

# Exhibit B

Updated 10-19-21

**Expert Witness Experience**
# Glenn May
925.353.4543
propac@rocketmail.com

**Summary of Experience:**
- 12 Total Cases
- 2 Testimonies in Depositions (2 additional pending)
- 1 Case Pending Trial (Jan 2022)
- 30 years of professional packaging experience

**Case Overview:**

1. 2021- (current/ongoing case): 18.Civ.10758(ER), United States District Court, Southern District of New York, Plaintiffs VariBlend Dual Dispensing Systems v. Gerhard Brugger and Crystal International Group; Expert Witness for law office representing Defendant regarding alleged breach of dispensing technology licensing agreement.  Contact Kyle J Fleming, Associate: Fish & Richardson P.C. (332) 201-4164 kfleming@fr.com

2. 2021- (current/ongoing case): Case No. Case No. 2:18-cv-00364-CAS-E, Plaintiffs Metricolor LLC v. L'Oreal USA/Redken 5th Avenue; Expert Witness for Orrick, Herrington & Sutcliffe LLP, representing Defendant L'Oreal regarding claimed breach of contract, misappropriation of trade secrets, breach of the covenant of good faith and fair dealing, violation of California's Unfair Competition Law, common law breach of confidence, and misappropriation of trade secret in case before US District Court Central District of California.  Research and Expert Report on prior art, technology, dispensing components and packaging industry.  Contact atty Richard Martinelli with Orrick at email rmartinelli@orrick.com

3. *2021- (current/ongoing case): Edgewell Personal Care Brands, LLC, et al. v. Munchkin, Inc.*
   No. 2:18-cv-03005-PSG-JPR (Central District of California); Expert witness for Lathrop GPM LLP representing Defendant Munchkin, Inc. regarding claimed patent infringement related to infant care accessories.  Attorney contact info: Luke Meriwether, Partner at Lathrop GPM LLP, ph: 816.460.5312, email: luke.meriwether@lathropgpm.com

4. 2021- (current/ongoing case): Case No. 01-20-0001-7551, Plaintiffs Wild/Indag Capri Sun GmbH v. Kraft Heinz Foods Company; Expert Witness for Kirkland & Ellis LLP, representing Defendant Kraft regarding claimed trade secret & breach of confidentiality in arbitration before the International Centre for Dispute Resolution.  Research on prior art, Expert Report provided.  Contact atty Luke Budiardjo with Kirkland & Ellis at 917.821.6804 or email luke.budiardjo@kirkland.com

5. 2021- (current/ongoing case): Case No. TBD, Plaintiffs District Attorney Santa Cruz County v. Church & Dwight, Expert Witness for Proskauer representing Defendant Kraft regarding claimed packaging slack fill issues.  Research on prior art, analyze product samples, arguments & Expert Report provided.  Contact Proskauer attorney Jennifer Yang at 510.229.9219 jyang@proskauer.com.

6. 2021- (current/ongoing case): Case No. 3:20-cv-00667-JD, Plaintiffs Five Star Gourmet v. D6 & Ready Pac Foods, Expert Witness for Stoel-Rives LLC, representing Defendant D6 regarding Petitioner's claimed design patent on thermoform tray assembly.  Research on prior art, Expert Report provided.  Expected to go to trial within 2021.  Contact atty. Nathan Brunette

Nathan.brunette@stoel.com, cell 503.505.3651

7. 2021- (current/ongoing case): Case No.:  IPR2020-01249, SEALED AIR CORPORATION, Petitioner v. RANPAK CORP., Patent Owner, represented by Renner-Otto, atty. Mark Johnson, mjohnson@rennerotto.com, (216) 736-3170, related to claimed patent infringement and IPR for cushioning dunnage packaging materials and equipment.  Provided expert report and Deposition testimony.

8. 2021- (current/ongoing case): Case 6:20-cv-01702-PGB-LRH, Plaintiffs Modified Atmosphere Enterprises LLC (M.A.E.) v. Defendant Fresh Express Brands Incorporated, represented by Eversheds Sutherland, attys. Cameron Murphy cameronmurphy@eversheds-sutherland.us, ph. 404.407.5217, and Ann Fort annfort@eversheds-sutherland.us

9. 2020- (current/ongoing case, details confidential): Case No. 5:18-cv-02436, Central District California re: Patent Infringement, Trade Dress Infringement, Violation of Unfair Competition Law IMS Expert Witness: Client: Morgan, Lewis & Bockius LLP, representing Defendant ReadyPac-regarding Petitioner's claimed design patent for fresh produce packaging and trade dress.  Extensive research on prior art, ornamental vs. functional design choices. Primarily working with Morgan, Lewis & Bockius LLP atty Ehsun Forghany ph. 650.843.7226, ehsun.forghany@morganlewis.com | www.morganlewis.com main 650.843.4000 (can also contact atty. Scott D. Sherwin at 312.324.1789)

10. 2020- (current/ongoing case, details confidential: Case No. 2:20-cv-04723-AB, Plaintiffs Clearly Clean Products, LLC ("CCP") and Converter Mfg, LLC ("CM") v. Tekni-Plex, Inc ("TPI") d/b/a Dolco Packaging Corp. ("DP") and Commodore Plastic, LLC IMS Expert Witness: Client: Michael Fisher of Dechert LLP, representing Defendant Tekni-Plex-regarding claimed patent infringement related to thermoform packaging.  Attorney contact info: Michael.fisher@dechert.com +1 215 994 2079 Direct, +1 917 406 5729 Mobile

11. 2019- Case No. 1:17-cv-04259-LLS, United States District Court, Southern District of New York IMS Expert Witness: Client: Jenner & Block, LLP for Plaintiff Diageo- seeking to defend trade dress of spirits packaging, including bottle finish, closure style, embossing, labeling, bottle shape & taper, glass color, product description, some design patent claims.  Expert report submitted, provided recorded Deposition at Defendant atty offices of Arent Fox in NYC.  Pending deposition & testimony at trial.  Primarily worked with Jenner & Block atty Jacob Alderdice, jalderdice@jenner.com, ph. 212 8911625, cell 347.266.5355

12. 2019- Case 8:18-cv-01305-CJC-DFM, involving Patent US D763,684S, dated Aug 16, 2016.  Selected to be IMS Expert Witness for Defense seeking to continue use of paperboard packaging which is claimed to infringe on trade dress of Plaintiff's package for confectionary product ("individual clear top cube w/ label w/ patterned band and shapes, and triangular end-tab containing candy product").  Case settled after my initial expert report, where I opined on prior art, commonality of design elements, including aesthetics, graphics, and functional aspects.

**Additional Related Expert Work**:

a.  2017- Expert for Consumer Packaged Goods company seeking compensation for defective closure design and processing resulting in malfunction of Child Resistance Packaging and product recall.  Expert report submitted detailing failure mode, root cause, corrective action; participated in Meet & Confer for negotiations between client and suppliers; settled out of court and client prevailing with settlement exceeding $4M in compensation.

b.  2014- Expert for Consumer Packaged Goods and packaging supply company (Diversey/Sealed Air) seeking remedy from closure manufacturer who was proven to produce a defective closure resulting in household chemical surfactant product leakage; Expert report submitted; settled out of court with my client prevailing.

c.  2007- Expert for Consumer Packaged Goods company (Method Products) needing detailed report identifying points of similarity of infringing personal care package versus client's Design Patented personal care (liquid hand soap) PET package; my report provided basis for Cease and Desist letter that settled out of court, resulting in discontinuation of infringing party's product sales and proof of destruction of their blow mold tooling.


**Professional Recognition and Patents**

1. 2001 IoPP AmeriStar Best of Food Category Packaging Award, (HV Easy Squeeze Inverted Bottle w/ silicone valve)

2. 2001 WordStar Award (HV Easy Squeeze Inverted Bottle w. Silicone Valve)

3. Clorox R&D 2004 "Certificate of Recognition for Outstanding Performance" on project Viper (Redesigned Litter Pails).

4. Awarded US Patent D471,462 for HV Easy Squeeze Inverted Bottle w. Silicone Valve.



## Container for salad dressing or the like

US • USD471462S1 • **Glenn P. May** • The Clorox Company

Priority 2001-09-04 • Filed 2001-09-04 • Granted 2003-03-11 • Published 2003-03-11

The ornamental design for a container for salad dressing or the like, shown and described.

5. 2008 IoPP Ameristar for Method molded bamboo fiber packaging used with omop cleaning tools and components.

6. Awarded US Patent USD425411S for novel confection dispensing package while at Nestle

## Candy dispenser

US • USD425411S • **Glenn P. May** • Nestec S.A.

Priority 1999-01-25 • Filed 1999-01-25 • Granted 2000-05-23 • Published 2000-05-23

The ornamental design for a candy dispenser, as shown and described.

7. Awarded US Patent for omop cleaning tool design (unique curved handle and functionality).

## Mop



US AU CA • USD579165S1 • **Glenn May** • Method Products, Inc.

Priority 2007-03-21 • Filed 2007-12-26 • Granted 2008-10-21 • Published 2008-10-21

We claim the ornamental design for a mop, substantially as shown and described.

8. Received 2 utility patents on Ecologic Brands packaging components (load-bearing telescoping lid and equipment patent)

## Containers for particulate materials



WO EP US • US20170021995A1 • **Glenn May** • Eco.Logic Brands Inc.

Priority 2013-10-02 • Filed 2016-03-30 • Published 2017-01-26

Containers for holding particulate materials are provided. The containers may be formed from molded pulp. The containers may included molded pulp shaped or threaded features formed integrally on the container that may aid in providing closure to the device. The containers may optionally include a …

9. 2015 AmeriStar Winner of "Best in Category" for Ecologic Brands Nestle-Purina ProPlan Cat Litter molded fiber containers

**SUSTAINABLE PACKAGING AWARD WINNER:**

**CATEGORY: Household Products**
Purina® Pro Plan® Renew™ Cat Litter Jug
Ecologic Brands & Nestle Purina



Ecologic Brands is a designer and manufacturer of molded fiber bottles made from 100% recycled cardboard and newspaper to form a unique, innovative, and disruptive container. The Purina® Pro Plan® Renew™ cat litter jug, developed in partnership with Nestlé Purina® PetCare, is Ecologic's first bottle made entirely from molded fiber, including the friction-fit cap. There is not a trace of plastic material in this package! The package conveys the brand's commitment to natural materials while maintaining a consumer-friendly, easy-to-pour design.

## 10. CPP (Certified Packaging Professional) by IoPP (Institute of Packaging Professionals)

## Feedback/testimonial:

17335 | Modified Atmosphere Enterprises LLC v. Fresh Express Brands Incorporated | Work Ended     Yahoo Mail/Inbox     ★

 **Krystal Heitland** <kheitland@expertservices.com>     Wed, Sep 1 at 9:43 AM  ★
To: propac@rocketmail.com

Hi Glenn,

I hope this email finds you doing well today.  We have been notified by counsel for Job #17335 | Modified Atmosphere Enterprises LLC v. Fresh Express Brands Incorporated that the case has concluded and there will be no additional work assigned.  I want to share with you that how happy counsel was with your work on this project. Ann commented at how pleased she was with your ability to provide maximum impact while managing costs all while performing under the gun. They further shared that the case settled favorably for the client.

Thank you for your assistance in making this a successful engagement, and with your permission we will keep you in mind for future expert opportunities.

Warmest Regards,

Krystal Heitland



Krystal Heitland
Engagement Manager

PERSUASION STRATEGY
EXPERT SERVICES
JURY CONSULTING
TRIAL GRAPHICS

Direct: 850.473.6969
Office: 877.838.8464
kheitland@expertservices.com

Industry Insights
expertservices.com

# Exhibit C

# List of Documents Reviewed

1. IOV_000047 – IOV_000062
2. IOV_000197 – IOV_000213
3. IOV_000593 – IOV_000593
4. IOV_000594 – IOV_000594
5. IOV_000631 – IOV_000634
6. IOV_000636
7. IOV_000645 – IOV_000649
8. IOV_000668
9. IOV_000670
10. IOV_000695 – IOV_000697
11. IOV_000718 – IOV_000719
12. IOV_000720 – IOV_000721
13. IOV_000722
14. IOV_000723 – IOV_000724
15. IOV_000725 – IOV_000726
16. IOV_000727 – IOV_000728
17. IOV_000729 – IOV_000730
18. IOV_000731 – IOV_000732
19. IOV_000733 – IOV_000734
20. IOV_000735 – IOV_000736
21. IOV_000737 – IOV_000738
22. IOV_000739 – IOV_000740
23. IOV_000741 – IOV_000742
24. IOV_000695 – IOV_000697
25. 30(b)(6) Deposition transcript of Valentine Enterprises, taken on November 3, 2021
26. Mintel GNPD report for "Iovate pre-workout"